**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRETT M. MALAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-10490 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| HINSDALE TOWNSHIP DISRICT #86, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the motion for summary judgment [73] filed by Defendant Hinsdale Township District #86. For the reasons set forth below, Defendant's motion for summary judgment [73] is granted in part and denied in part. The Court gives Defendant until July 22, 2019 to file a brief no longer than five pages addressing whether a hostile work environment claim can be brought under the Americans with Disabilities Act. Further status hearing set for July 25, 2019 at 9:00 a.m.

**I.      Request for Discretionary Consideration**

Before turning to the background of this employment discrimination action, the Court must address the deficiencies of Plaintiff's submissions and how the Court is handling those deficiencies. Perhaps recognizing that his submissions are deficient, Plaintiff has filed a "request for the Court's discretionary consideration" asking that "for key, pivotal issues/facts so deemed by the Court that could prove determinative in a ruling against one or more of [his] claims that [Plaintiff] be permitted opportunity to fix, clarify/amend or otherwise remedy defects/deficiencies in [his] filings where relevant." [72, at 1-2.] The Court recognizes that it was difficult for

Plaintiff to put together the materials that he submitted in opposition to Defendant's motion for summary judgment, not only because of Defendant's status as a *pro se* litigant but also because of the very disabilities that are at issue in this employment discrimination action.

At the same time, Plaintiff's status as a *pro se* litigant does not excuse him from complying with the rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure." (citation omitted)). While it is true that *pro se* submissions are construed liberally, "[t]he essence of liberal construction is to give a *pro se* plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citing *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998)). "However, a lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes[.]'" *Id.* (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1993)). Furthermore, to the extent that Plaintiff contends that his disability limits his ability to present his arguments, Plaintiff could have retained a lawyer or, if Plaintiff is indigent, asked that the Court recruit an attorney on his behalf. Although the Court is sympathetic to the difficulties faced by Plaintiff, it would be unfair and burdensome to give Plaintiff multiple bites at the apple. The Court therefore denies Plaintiff's request for the Court to give him the opportunity to correct any deficiencies.

Plaintiff's response to Defendant's Local Rule 56.1 statement and Plaintiff's own Local Rule 56.1 statement are in many respects improper. To begin, under Local Rule 56.1, "facts that

go beyond what is fairly responsive to the movant's Local Rule 56.1(a)(3) assertions" must be made in the non-movant's Local Rule 56.1(b)(3)(B) response. *Buford v. Laborers' Int'l Union Local 269*, 2019 WL 184052, at *3 (N.D. Ill. Jan. 14, 2019). For the most part, Plaintiff's response to Defendant's Local Rule 56.1 statement does not comply with this requirement and therefore will be disregarded, except where Plaintiff notes a deficiency with Defendant's own statement or provides necessary context for Plaintiff's admission. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming district court's refusal to consider facts proposed in the plaintiff's Local Rule 56.1 where "response contained several extremely long, argumentative paragraphs, and in those paragraphs [plaintiff] simultaneously denied the veracity of [defendant's] proposed material facts and presented additional facts of his own"); see also *Eason v. Nolan*, 416 F. App'x 569, 570 (7th Cir. 2011) ("[T]he district court did not abuse its discretion when it disregarded the additional facts that [the non-movant] included in his [Local Rule 56.1(b)(3)(B)] response.").

Plaintiff's response to Defendant's Local Rule 56.1 statement and his own Local Rule 56.1 statement also include improper factual and legal argument. "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). By way of example, Plaintiff's Statement of Fact No. 32 states:

> [Plaintiff] was treated less favorably after his room accommodation request in September 2014 and was criticized in evaluations for professional practices his colleagues were allowed to do. Palmer's post-conferences and evaluations of [Plaintiff] were neither honest, accurate, or correct and were 100% negative with no constructive feedback on how to improve. Palmer quoted a portion of her formal observation notes in her post-observation form. Palmer altered this quoted portion by adding, deleting and resequencing material to make [Plaintiff's] teaching appear "disconnected," to falsely support her evaluative conclusions about him, and to counter statements in a corrected-for-omissions version of her notes that he gave her. In her summative evaluation Palmer criticized [Plaintiff] for 1) an

accommodation request idea he shared with her from his May 1, 2012 letter, 2) for missing a meeting while omitting he was on a short-term medical leave she approved, 3) for leaving "early" from a meeting while omitting that he worked part-time and was allowed to do so, 4) for disability symptoms, 5) for specific jobs like collaboration, communication and instruction for which he had requested and requested accommodations for since 2012, 6) for sending numerous emails asking to stop the evaluation process while omitting the reasons for his requests, including complaints of retaliation, violation of ADA, lack of ADA interactive process, failure to accommodate, 7) and more. (Ex. C, Palmer Ex. No. 9, 12, 15; Ex. D, #4 ¶¶90; 26-27, 36-39, pg. 13, ¶¶41, 43, pg. 15, ¶¶44, 46, 48-50, 53, 56-62, 64, 66-68, 74-79, 81-84, 86-87; Ex. K, pgs. 170-171, 190-194, 224-225, 277-280; Ex. M, pgs. 18-21; Ex. P, ¶6, 64;).

This is the kind of statement that could be included in a brief and supported by proper statements of fact. However, this is not in itself a proper statement of fact as it includes factual and legal argument. The Court therefore will disregard this statement and other statements/responses to the extent that they contain improper factual and legal argument. *Trumbull v. SCI Illinois Servs., Inc.*, 575 F. App'x 683, 685 (7th Cir. 2014) (affirming district court's decision to disregard facts and arguments improperly presented to the court in violation of Local Rule 56.1).

Furthermore, many of the assertions in Plaintiff's own Local Rule 56.1 statement are not short paragraphs as required by Local Rule 56.1. "Local Rule 56.1(b)(3)(C) provides that a party opposing a motion for summary judgment must file 'a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to * * * supporting materials relied upon.'" *Torres v. Alltown Bus Servs.*, 323 F. App'x 474, 475 (7th Cir. 2009). Again, by way of example, Plaintiff's Statement of Fact No. 5 states:

From 2012 to 2015, [Plaintiff] repeatedly requested accommodations, asked his employer to meaningfully engage in the ADA interactive process versus giving the appearance of complying without answering his main requests or offering alternatives, and expressed his willingness to collaborate and openness to his employers' accommodation suggestions a combined total of over seventy-five (75) times (Ex. A, pgs. 266-267; Ex. D, #6 ¶¶1-54; #7 ¶¶1-11; Ex. K, pgs. 65, 77-80, 90-93, 98, 113, 115-120, 134, 149, 197-200, 224-225, 232-234, 242-258, 259-261, 265-266, 276- 280, 281, 283, 289-291). He stated that in the 2014-15 year, retaliation forced him to request a short-term medical leave, reduced part-time

schedule and continued stockroom use he needed no permission for that he received and was penalized for all three in evaluations (Ex. D, #4 ¶¶44, 46,59, 68, 90; Ex. P, ¶¶53).

This long statement of fact purports to address approximately 75 purported requests for accommodation occurring over a multi-year period and therefore is improper. *Maclin v. A.M. Bus Co.*, 2006 WL 463370, *2 (N.D. Ill. Feb. 22, 2006) (stating that "compounding of facts into an amalgamated paragraph is not permissible" and disregarding certain paragraphs); *Malec v. Sanford*, 191 F.R.D. 581, 582 (N.D. Ill. 2000) ("[I]t is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one opponent missing one."). The Court therefore disregards this statement and other similarly improper statements (specifically, Plaintiff's Statement of Fact Nos. 2, 4-8, 10-12, 15, 17-19, 21-25, 28, 31-39, 63, 83, 93, 104, and 107), except to the extent that they include facts admitted by Defendant. *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) ("We have repeatedly held that requiring strict compliance with [Local] Rule 56.1 is not an abuse of the district court's discretion." (citing *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)); see also *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("The purpose of [Local] Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.").

Plaintiff's submissions also include many facts that are not relevant to resolving the issues before the Court.[1]  For example, Plaintiff identifies facts regarding when Defendant learned about

---

[1] The Court notes that some of Defendant's statements of fact also are irrelevant to the Court's analysis. For example, Defendant's Statement of Fact No. 5 discusses Plaintiff being on a curriculum team during the 2006-07 school year.  The Court does not find this statement to be relevant to the issues before the Court, which relate to conduct occurring in 2012 or later.

certain of Plaintiff's disabilities. [60-2 (Pl.'s Stmt. of Add'l Facts), ¶ 2.] However, Plaintiff does not tie these facts to a relevant argument. None of Defendant's arguments for summary judgment hinge on whether Defendant knew of Plaintiff's disabilities at a particular time. Similarly, many of Plaintiff's statements of additional facts merely assert what certain communications from Plaintiff stated. [See, *e.g.*, 60-2 (Pl.'s Stmt. of Add'l Facts), at ¶¶ 70-78, 80.][2] Although Defendant admits that Plaintiff accurately characterizes these communications, the abbreviated language used in the communications makes it difficult for the Court to analyze when not placed into context. Furthermore, Plaintiff does not explain how these communications themselves are relevant. For example, Plaintiff does not rely on these communications to establish notice. The Court therefore does not find these assertions helpful to the resolution of the issues before the Court on Defendant's motion for summary judgment and therefore disregards them. To the extent that Plaintiff seeks to establish the facts asserted within these communications, the facts should have been asserted separately and supported by admissible evidence.

Plaintiff also fails to put other statements of fact in context. For example, Plaintiff's Statement of Fact No. 81 attempts to draw a connection between a conversation Plaintiff had with his colleague Adam Hallihan and a statement in Plaintiff's final summative evaluation about Plaintiff draining "extra time from our teachers and his department chair when he pulls them aside individually to discuss what took place at team meetings or when he sends emails that the team members then have to read." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 81.] Plaintiff's brief and Local Rule 56.1 statement fail to put these statements into context. Additionally, Plaintiff fails to cite any authority for certain statements. [See 60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 82.]

---

[2] Although Statement of Fact No. 69 uses a similar format, the substance of the email is detailed and coherent enough to provide the needed context. The Court therefore includes that statement in the background below.

Plaintiff's statement of facts also included numerous statements regarding what Defendant represented to the EEOC. [See, e.g., 60-2 (Pl.'s Stmt. of Add'l Facts), at ¶¶ 109-11.] Although the Court considered these statements to the extent relevant, as noted below, the Court otherwise disregards these statements as irrelevant to the issues before the Court on Defendant's motion for summary judgement.

In sum, the Court disregards most of Plaintiff's responses and Plaintiff's own statements of fact as improper. "[D]istrict courts are not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" *Curtis*, 807 F.3d at 219 (quoting *Bordelon v. Chicago Sch. Reform Bd.*, 233 F.3d 524, 529 (7th Cir. 2000)).

That being said, "courts generally prefer to resolve disputes on their merits instead of procedural technicalities." See *Fidelity & Deposit Co. v. Ramco Indus.*, 1996 WL 392164 at *3 (N.D. Ill. July 11, 1996). The Court therefore has reviewed many of the underlying documents identified by Plaintiff, even though the Court was not required to do so. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014) ("'The court need consider only the cited materials, but it may consider other materials in the record.'" (quoting Fed. R. Civ. P. 56(c)(3)). Furthermore, the Court has accepted facts that Defendant admits in its response to Plaintiff's statement of additional facts. Where the parties properly dispute the other party's characterization of the evidence, the Court has looked to the underlying evidence and accepted only properly supported assertions. Finally, the Court notes that both parties rely on unauthenticated documents. Because the parties have not raised any objection to the evidence before that Court based on any failure to authenticate, the Court assumes that the evidence presented to the Court properly can be presented at trial. With these principles in mind, the Court now turns to the factual summary.

## II.    Background

Plaintiff Brett Malas is a resident of Montgomery, Illinois.   [21 (Def.'s Stmt. of Facts), at ¶ 1.]   Plaintiff was a high school teacher for eighteen years.   He has degrees in biology and paleontology.   Plaintiff has a professional educator's license from the State of Illinois and is qualified to teach biology, earth science/geology, and chemistry.   [*Id.* at ¶ 4.]   Plaintiff also is qualified to teach health.   [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 4.]   Hinsdale Township School District No. 86 is a school district that educates high school students.   [21 (Def.'s Stmt. of Facts), at ¶ 2.]   Its administrative offices are located in Hinsdale, Illinois.   [*Id.*]   There are two high schools in the District—Hinsdale Central High School ("Hinsdale Central") and Hinsdale South High School ("Hinsdale South").   [*Id.*]   For the purposes of this motion, the Court refers to both Hinsdale Township School District No. 86 and Hinsdale South High School as "Defendant."   During the relevant time period (2006-2015), Plaintiff was employed by Defendant Hinsdale Township School District No. 86 as a science teacher at Hinsdale South High School under the immediate supervision of Science Department Chair Dr. Julie Gaubatz.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 1.]

Plaintiff began teaching at Hinsdale South during the 2006-07 school year.   [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶3.]   He became a full-time teacher during the second semester of that school year and was assigned to teach biology and transitional program of instruction ecology.   [*Id.*]   During his nine-year employment, Plaintiff was never issued any reprimands, warnings, or disciplinary notices of any kind.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 1.]   Plaintiff has been diagnosed with: (1) attention deficit hyperactivity disorder ("ADHD"), (2) depression, (3) anxiety, (4) tic/Tourette's disorder, (5) sleep apnea and (6) post-traumatic stress disorder (PTSD).   [*Id.* at ¶ 2.]

During the 2007-08 school year, Plaintiff was assigned to teach three biology sections and two earth science sections. [21 (Def.'s Stmt. of Facts), at ¶ 6.] At some point, Dr. Gaubatz gave a presentation that showed how science teachers would be assigned to classes beginning with the 2008-09 school year. [21 (Def.'s Stmt. of Facts), at ¶ 7.] This plan[3] showed how the science department could implement a program of studies change whereby it offered a physics, chemistry, biology program of studies and a geophysics class. [*Id.* at ¶ 8.] During the 2008-09, 2009-10, and 2010-11 school years, Plaintiff was assigned to teach both geophysics and chemistry. [*Id.* at ¶ 9.]

## A.  2011-12 School Year

In the 2011-12 school year, Plaintiff was assigned to teach AP biology and geophysics. [*Id.* at ¶ 10.] On April 22, 2012, Plaintiff underwent a psychiatric evaluation with Dr. Petit Ndrio because Plaintiff was having difficulty focusing and had symptoms that affected his functionality.[4] [21 (Def.'s Stmt. of Facts), at ¶ 16.] In 2012, Plaintiff discussed his brain with Dr. Gaubatz and showed her pictures of his brain spect results. [*Id.* at ¶ 11.] He explained how continual changes to his schedule had been negatively affecting him. [*Id.*] In April 2012, Dr. Gaubatz gave Plaintiff his schedule for the 2012-13 school year, making changes to the schedule days after she initially gave the schedule to Plaintiff. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 12.] He was not told nor has he heard anybody say that he was given that schedule because of his disabilities. [21 (Def.'s Stmt. of Facts), at ¶ 12.]

---

[3] Plaintiff disputes Defendant's characterization of the plan as hypothetical. Because the distinction is irrelevant, the Court omits any reference to the plan being hypothetical.

[4] The Court agrees that Defendant's assertion that Dr. Ndrio had no concerns about Plaintiff's ability to perform as a teacher is not supported by the record cites. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 16.] The Court therefore disregards that fact.

On or about May 1, 2012, in response to his 2012-13 schedule, Plaintiff wrote a letter to Dr. Guabatz regarding his claimed disabilities.[5]   [*Id*. at ¶ 13.]   In the letter, Plaintiff asked "that due consideration be given to [his] disabilities in the evaluation process and that [he] be evaluated on the basis of non-disability related concerns."   [21-7, at 11.]   Attached to the letter is chart summarizing Plaintiff's claimed disabilities (specifically, his anxiety, depression, ADHD, and other "miscellaneous" conditions).   [*Id*. at 12-13.]   The chart also identifies five "job accommodation requests" made by Plaintiff.   [*Id*. at 14-15.]   First, Plaintiff asked for continued understanding and patience as he worked through difficult issues.   Second, Plaintiff asked for the opportunity to take ownership and fix problems, along with the necessary feedback to do so. Third, Plaintiff asked to collaborate on strategies for improved communications.   Fourth, Plaintiff asked for the opportunity to maximize job performance by putting disability-related strengths to greater use for the benefit of students, colleagues, the school, and the community.   Fifth, Plaintiff asked for due consideration of his disabilities when scheduling teacher assignments.   With respect to the fifth request, Plaintiff provided further elaboration,[6] asking that (a) Defendant assign Plaintiff teaching schedules with the goal of moving toward a more stable teaching routine that would afford greater consistency, (b) Defendant consider co-teaching as an option for Plaintiff when working with disabled students, and (c) consolidating Plaintiff's 2012-13 teaching schedule from three rooms to two rooms.   On August 16, 2012, Plaintiff met with School District

---

[5] In his statement of additional facts, Plaintiff includes details of this May 1, 2012 letter.   Although the Court reviewed these details, the Court does not restate them here.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶¶ 42-54.]

[6] The Court notes that Plaintiff also provided further elaboration with respect to the other requests in his letter.   However, Plaintiff's fifth request is the most pertinent to the issues before the Court.   As discussed below, the Court is focusing its analysis regarding requested accommodations on the requested accommodations specifically discussed in Plaintiff's brief.

representatives to discuss his May 1, 2012 letter. [*Id.* at ¶ 15.][7] Defendant neither accepted nor rejected Plaintiff's ideas regarding accommodations. [*Id.*]

Plaintiff was evaluated in 2011-12. [21 (Def.'s Stmt. of Facts), at ¶ 7.] He received a satisfactory rating and was able to perform his duties in a satisfactory manner that school year. [*Id.* at ¶ 14.] As noted by Plaintiff, under the rating system in effect at the time, a satisfactory rating was between an "excellent" and "unsatisfactory" rating and meant performance concerns for a tenured teacher.[8] [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 14.]

**B. 2012-13 School Year**

During the 2012-13 school year, Plaintiff was assigned to co-teach biology and academic reading biology. [21 (Def.'s Stmt. of Facts), at ¶ 17.] Although Plaintiff testified that he believed he was professionally capable of teaching the academic reading biology course, he also testified that the did not feel like he "was given adequate training related to the special needs of students" in that class. [21-1 (Pl.'s Dep. Tr.), at 173-74.] Plaintiff testified that he believed his performance during the 2012-13 academic school year suffered from a lack of accommodations, his health, disabilities, and his arrangement with his academic reading biology co-teacher Maria Conyer. [*Id.* at 186.] Plaintiff testified that he often had to stay up late because he would receive Ms. Conyer's portion of the lesson late on the night before class. [*Id.* at 186-87.] Ms. Conyer

---

[7] Although Defendant provided the wrong record cite for this assertion, Plaintiff admits the statement subject to the inclusion of additional facts that could have been included in Plaintiff's own Local Rule 56.1 statement. These additional facts are disregarded to the extent that they were not otherwise properly presented to the Court.

[8] Defendant challenges this statement on the grounds that it improperly was included in Plaintiff's response to Defendant's Local Rule 56.1 statement and not in Plaintiff's own Local Rule 56.1 statement. However, the Court will consider this statement as additional context to explain Plaintiff's admission, especially given Plaintiff's *pro se* status.

also wanted to change her lesson plan. [*Id*.] Plaintiff testified that his problems with Ms. Conyer "ultimately led to [his] need for long-term medical leave." [*Id*. at 187.]

Plaintiff went on medical leave in February 2013. [21 (Def.'s Stmt. of Facts), at ¶ 20.] Although Plaintiff testified that his daughter threatening to hurt herself was the "final straw" that necessitated the leave, he also testified that "[t]he main thing was the only one day ahead planning" of his academic reading biology co-teacher Ms. Conyer. [21-1 (Pl.'s Dep. Tr.), at 209-10.] At the request of Director of Human Resources Troy Courtney, Plaintiff underwent a fitness-for-duty examination. [21-1, at 215.] In his April 1, 2013 fitness report, Dr. Peter Fink stated: "Given the facts as stated by [Plaintiff], [Plaintiff] should undergo psychological/neuropsychological evaluation by a licensed clinical physiologist proficient with qualifications in neuropsychology to further and comprehensively assess [Plaintiff]. Until the completion of such an examination, my opinion on fitness is reserved." [*Id*. at 216.] The report noted that Plaintiff suffered from ADHD and depression. [*Id*.] The report also discussed Plaintiff's "self-described stress related depression and anxiety." [*Id*. at 219.]

Plaintiff received a "needs improvement" rating for the 2012-13 school year, which is a rating between "proficient" and "unsatisfactory." [21 (Def.'s Stmt. of Facts), at ¶ 22.] When asked whether he remembered any reasons Dr. Gaubatz provided for giving Plaintiff a "needs improvement" rating, Plaintiff testified that two stood out: (1) his purported need to change his lesson plan and to deviate from the biology team calendar, and (2) an e-mail exchange with a sister/legal guardian of a student. [21-1 (Pl.'s Dep. Tr.), at 185.] Plaintiff challenges the sincerity of these justifications. [*Id*.] By August 11, 2013, in an updated fitness evaluation, Dr. Fink stated:

> Based on my clinical evaluation and the neuropsychological testing of Dr. Nugent, [Plaintiff] is fit to perform his duties as an educator for the District. Although

[Plaintiff] has taken the position that he would prefer a half time position [sic], the District has no such positions. Returning [Plaintiff] to a full-time position, I recommend that [the] administration monitor [Plaintiff's] work responsibilities regularly. Initially, weekly meetings would provide both the District and [Plaintiff] practical information about job performance. Thereafter, the level of supervision necessary should be empirically determined. Ultimately, [Plaintiff] will or will not meet the Districts [sic] expectations for job performance.

[49-1, at 240-41.] On February 27, 2014, Plaintiff filed a charge of discrimination with the EEOC, relating to his May 6, 2013 needs improvement performance evaluation. [21-1, at 258-59.] Plaintiff and Dr. Gaubatz never discussed the EEOC charge. [21 (Def.'s Stmt. of Facts), at ¶ 33.]

### C.    2013-14 School Year

The process of assigning subjects and classes to the science teachers at Hinsdale South High School is a complicated one. [21 (Def.'s Stmt. of Facts), at ¶ 25.] Plaintiff was assigned to teach biology and academic reading biology for the 2013-14 school year with a co-teacher, Randy Brogan, and this schedule was determined before the start of the school year. [*Id.* at ¶ 26.] During the 2013-14 school year, Plaintiff and Dr. Gaubatz had weekly meetings. [*Id.* at ¶ 27.] During a discussion about the 2014-15 schedule, Dr. Gaubatz mentioned that Plaintiff "was somehow deviating from the curriculum or asking to that." [21-1 (Pl.'s Dep. Tr.), at 469-70.] Plaintiff claims he did no such thing. [*Id.*]

On February 18, 2014, Plaintiff met with Domenico Maniscalco, the District's Chief Human Resources Officer. [21 (Def.'s Stmt. of Facts), at ¶ 28.] During this meeting, Plaintiff requested accommodations. When asked what accommodations he requested at that meeting, Plaintiff testified:

I gave him a little background about all the changes in my schedule, the need for a consistent schedule. He asked what my ideal teaching schedule would be. I told him that at this point where I was health wise, disability wise it would be helpful to have all biology in one room, and that would be the ideal. And I said academic

reading biology was not an ideal fit for me, but at this point I needed consistency. So if I couldn't get the biology, if I could just keep on the same schedule I had for the [20]13-14 year with the same co-teacher because I needed – desperately needed consistency in my schedule.

[21-1 (Pl.'s Dep. Tr.), at 243-44.] During this meeting, Plaintiff also asked (1) for a temporary suspension of his "needs improvement" rating until it could be determined whether it "resulted from poor performance or if it was disability related and could have been remedied with reasonable accommodations," (2) to teach summer school for health as he had in prior years but was unable to do the most recent summer because of a delay in the fitness-for-duty determination, and (3) for his personnel file to review. [*Id.* at 241-42.] Mr. Maniscalco said no to Plaintiff's request regarding the "needs improvement" rating but told Plaintiff that he could teach summer school.[9] [*Id.* at 243.] According to Plaintiff, Mr. Maniscalco further stated, "I promise I will see to it personally that your schedule will be the same or better as this year" meaning that Plaintiff would be "teaching the same classes as this year [*i.e.*, biology and co-taught academic reading biology] in one room or teaching all biology classes."[10] [50-1 (Pl.'s Ex. D), at 9; 55-1 (Pl.'s Ex. K), at 65, 89, 92.]

On May 9, 2014, Plaintiff received a summative rating of "proficient" for the 2013-14 school year. [21 (Def.'s Stmt. of Facts), at ¶ 34.] At a May 9, 2014 summative conference, Plaintiff said he was told by Dr. Gaubatz that he met all performance expectations, that he would be rated "proficient" for the 2013-14 school year, and that the only reason he was not rated

---

[9] Plaintiff denies that Defendant actually permitted him to teach summer school. Because Plaintiff's desire to teach summer school is not discussed in Plaintiff's brief, the distinction is not relevant to the Court's analysis, which addresses the issues actually raised in the briefing.

[10] Although this fact was not properly presented to the Court, the Court takes note of the evidence supporting this assertion. The Court recognizes that Defendant likely disputes this fact. However, on Defendant's motion for summary judgment, the Court must construe all facts in favor of Plaintiff. *Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016).

"excellent" was because she "had to" write his Professional Growth Plan (PGP) that year. [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 66.] Plaintiff noted his lack of choice in that matter. [*Id.*] Dr. Gaubatz did not send Plaintiff's 2013-14 evaluation form to the Illinois State Board of Education. [21 (Def.'s Stmt. of Facts), at ¶ 35.] On May 22, 2014, Plaintiff sent an email to Dr. Gaubatz raising his disability-related concerns and requested accommodations. Specifically, Plaintiff wrote:

> Dr. Gaubatz retaliated 5 days later: instead of copying & pasting Summative "Areas for Growth" to my State form like she'd done prior 3 yrs, Dr. Gaubatz altered/reworked to portray me negatively on official State rating form that goes to Illinois School Board of Education (ISBE)-to falsely make it look like I'd been on an "Unsatisfactory" rating "remediation" plan for performance deficiencies "in all areas" during 13-14SY. I brought "Unsatisfactory" "remediation" implication to her attention; asked to change word, which she did. Did not catch full extent, though, until after submitted * * * [she also] omitted positives [she had written in his summative].

[60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 67.]

During the 2013-14 school year, Plaintiff made numerous other complaints regarding Defendant's response to Plaintiff's requested accommodations. In one complaint, Plaintiff stated:

> Dr. Gaubatz disregarded my disabilities/accom reqs during 13-14SY master sched. (Mar 2013). She had already determined most of colleagues' schedules but mine still in flux & "might be GeoPhysics, GeoPhysics + AP Biology, Biology + AP Biology, or Biology + Biology AR. And, of course, those are just estimates at this point - it could be some other combination. I wish I could be more specific, but we have a lot of details up in the air." My eventual schedule introduced more change when better all-biology-in-one-room sched existed. But opt. not presented or even discussed w/me; instead given to long-term sub.

[60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 64.] In another complaint, Plaintiff stated:

> My employer failed to provide accoms 13-14SY; didn't even engage in discussion re: disability needs/reqs, if help needed for transition back to work, etc.; despite my employer's: (1) knowledge of my disabilities/reqs, med. leave, & started disability appg. w/benefits coordinator Cathy Hannon's help; (2) fit-for-duty reports that discussed my condition, disabilities, prior accoms req, hope for accoms on return or might have to go on disability, risk for relapse/worsening; (3) request & receipt of additional med. info from my psychiatrist; (4) return-to-work mtg I was required

to attend that included attorneys' acknowledgment of med. diagnoses & stipulated work conditions (e.g. weekly performance checks; wanted immediate notice from my psychiatrist if discontinued/didn't follow treatment- due to supposed, undocumented "risk" I posed to students/colleagues).

[60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 65.]

### D. 2014-15 School Year Schedule

In February or March 2014, Dr. Gaubatz and Mr. Maniscalco advised Plaintiff that he was going to teach four sections of biology and one section of geophysics for the 2014-15 school year. [21 (Def.'s Stmt. of Facts), at ¶ 32.] On May 15, 2014, regional union representative Naomi Shepherd emailed Mr. Maniscalco on Plaintiff's behalf and asked him to honor the accommodation commitment he purportedly made on February 18, 2014 (*i.e.*, that Plaintiff would be able to have the same schedule in one classroom or all biology classes). [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 68.] She noted Plaintiff's proposed schedule did not conform to that commitment and that it put Plaintiff on two different curriculum teams. [*Id.*] She further noted that Mr. Maniscalco had yet to give an answer about returning a sick day to Plaintiff. [*Id.*] Mr. Maniscalco email replied and responded to the sick day inquiry only. [*Id.*] In a June 4, 2014 email reply to Mr. Maniscalco, which included union and District attorneys, Plaintiff wrote in part:

Regarding your "giving" me one extra biology, with respect, you simply repeated what my DC told you and had already earlier told me, which is why I need you to intercede and make good on your promise. The big picture issue, here, is that I need a more consistent teaching schedule akin to my colleagues. In the past four years alone I have had five different course preps with four different co-teachers spread over three different classrooms, including two co-taught classes not in 70/30 compliance. Next year's schedule represents a return to a class (geophysics) I haven't taught since the 11-12 SY and puts me on two different department teams (biology & geophysics). In addition, most science courses will be experiencing major curriculum changes next year as updates are made to align with NGSS (Next Generation Science Standards). As it stands, I'm now one of 2-3 science teachers tasked with working on two different curricula on two different teams, whereas the majority of my colleagues (16-17) are on one team. My health/disabilities have been adversely affected by the cumulative effects of my changing teaching schedule over the years. For the sake of my health/disabilities, I need your help.

[60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 69.]

In August 2014, Plaintiff again was treated by Dr. Ndrio. [21 (Def.'s Stmt. of Facts), at ¶ 36.] When asked about whether Plaintiff was "incapable of performing duties as a teacher in August of 2014," Dr. Ndrio testified:

> I mean, at this time knowing him for what, about more than a year, he was this patient that would miss appointment, would forget appointment. We'll give him scripts. He'll fall in the parking lot literally. We haven't had severe case of ADHD on adult side. So when he come and say, Dr. Ndrio, I can't focus. I am spread. They're giving me this teaching assignments; and, you know, I cannot handle it anymore. I would like to be taught in one subject. Given that he had major depressive disorder a year ago and, you know, looking at this picture, you know, I cannot handle it anymore. I would like to be taught in one subject. Given that he had major depressive disorder a year ago and, you know, looking at this picture, you know, it is very, very reasonable and fair from the therapeutic point of view to help this patient who have significant ADHD.

[21-2 (Ndrio Dep. Tr.), at 58-59.] Defendant contends that Dr. Ndrio "believed that [Plaintiff] was medically capable of performing the functions of a teacher." [21 (Def.'s Stmt. of Facts), at ¶ 36.] However, the cited deposition testimony does not support that assertion. When asked whether Plaintiff was incapable of teaching more than one subject area, Dr. Ndrio stated: "Incapable, I don't know if that is the correct word. I will put it this way: That him teaching in different subject areas would have caused more anxiety, would have caused more stress and would have destabilized him, and I articulated it in my letter. So, yes, with a medical certainty that him being spread teaching it's my opinion." [21-2 (Ndrio Dep. Tr.), at 61-62.] When asked again whether it was his medical opinion—to a reasonable degree of certainty—that Plaintiff was incapable of teaching more than one subject, Dr. Ndrio testified: "I will not say incapable. He *could* be capable." [*Id*. at 62 (emphasis added).] Although Dr. Ndrio again testified that Plaintiff

was medically capable of teaching more than one subject, Dr. Ndrio was cut off before he could fully explain how doing so would impact his condition. [*Id.*][11]

In September 2014, Plaintiff requested that he be allowed to teach his geophysics class in the same room (Room 107) as he taught his biology classes. [50-1 (Pl.'s Ex. D), at 11.] (Plaintiff was reprimanded for teaching his geophysics class in Room 107 without permission.) [*Id.*] On October 1, 2014, Dr. Gaubatz wrote an email to Mr. Maniscalco stating:

> GeoPhysics (and science in general) can be taught in any room, inside or outside, or really anywhere you have a skilled teacher; however, an optimal room for GeoPhysics, for both student learning and teacher collaboration opportunities, would be a room that is equipped for that content and used by teachers who teach that content.

[55-3, at 53.] Dr. Gaubatz goes on to explain the differences between Room 112 (Plaintiff's geophysics room) and Room 107 (his biology room). First, Room 112 had 6 computer statutes for geophysics team-designed lab investigations, while Room 107 did not have any computers. [*Id.*] Second, Room 112 had geophysics-centered posters, while Room 107 had biology-centered posters. [*Id.*] Third, Room 112 had geophysics lab equipment, while Room 107 had biology lab equipment. [*Id.*] Fourth, Room 112 had moveable tables for large motion labs, while Room 107 did not. [*Id.*] Finally, because there would be no other geophysics teachers in Room 107, there would be no geophysics papers on the side tables, writing on the whiteboard, etc. [*Id.*] In an email to Mr. Maniscalco from attorney William Gleason with the subject line "Room 112 VS 107,"

---

[11] Defendant also cites to Dr. Ndrio's affirmative response to Plaintiff's counsel question whether it would be acceptable for Plaintiff only to teach science classes. [21 (Def.'s Stmt. of Facts), at ¶ 46.] Given Dr. Ndrio's other testimony, the Court does not understand him to be saying that having Plaintiff teach multiple different science classes would be consistent with his recommendation (discussed more below) that Plaintiff only teach one course. Drawing all reasonable inferences in Plaintiff's favor, it is reasonable to infer that Dr. Ndrio believed that "science" was a class that Plaintiff could teach. This inference is supported by the fact that counsel prefaced the question about it being acceptable to teach all science classes with, "Okay, so one subject."

Mr. Gleason states: "I did review the email that you referenced. The first part where it says you can teach this class in any science class is really concerns me from an ADA perspective. If he can adequately deliver the necessary curriculum from the class we really should be giving it to him." [55-3, at 51.]

On October 8, 2014, Plaintiff saw Dr. Ndrio for a letter regarding work accommodations. [21 (Def.'s Stmt. of Facts), at ¶ 45.] Dr. Ndrio drafted a letter on behalf of Plaintiff, in which he stated:

> [Plaintiff] is treated in my clinic for severe Attention Deficit and Hyperactivity Disorder, inattentive type, with underlying depression, anxiety and tic disorder, for which he is being treated with psychotropic medications. While his treatment continues to be optimized, it will be beneficial for him to have predictable and consistent classroom teaching assignments, rather then [sic] numerous and/or unpredictable ones from year to year. Hence, it is strongly recommended that [Plaintiff] be assigned to a teaching schedule that will allow him to teach one course in one classroom in his areas of expertise, in order maintain good functionality and maximize job productivity. Also this will help improve his ability to perform better as an educator in his specialized subjects, while at the same time prevent destabilization of his underlying conditions.

[21-2, at 71.] Plaintiff went on short-term medical leave beginning late (*i.e.*, at the end of the day) on Friday, October 10, 2014. [21 (Def.'s Stmt. of Facts), at ¶ 50.] Plaintiff, Mr. Maniscalco, and union representative David Lapetino met on October 22, 2014.[12] [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 51.] After this meeting, at which Plaintiff's requested accommodations were discussed, Mr. Maniscalco notified Plaintiff that he would no longer be responsible for teaching geophysics. [57 (Pl.'s Ex. K.2), at 2.] Instead, his schedule would "consist of four Biology classes in one classroom." [*Id.*] Mr. Maniscalco stated: "[w]e can reassess whether you will continue to need this accommodation, or any other accommodation, for the 2015-2016 school year in late winter/early spring." [*Id.*] This reduced teaching load resulted in a corresponding

---

[12] Defendant's Statement of Fact No. 51 is not supported by the cited materials. The Court therefore accepts the statement only to the extent admitted by Plaintiff.

reduction in Plaintiff's salary. [*Id*.] "Based on the number of sections of biology the science department had in October 2014, the licenses of the other science teachers, and the requirement that those teachers remain in a full-time role," Defendant claims that it was "able to fulfill the doctor's recommendation, but could only offer [Plaintiff] four biology classes, rather a full-time schedule." [21-10 (Gaubatz Aff.), at ¶ 10.] Plaintiff denies this assertion, arguing that he "never requested a full-time 'biology only' schedule in the [2014-15 school year]." [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 53.] Plaintiff maintains that he only wanted to drop a biology class if his other accommodation requests were not granted. [50-1 (Pl.'s Ex. D), at 15.]

In December 2014, Plaintiff met with Mr. Maniscalco to discuss a document drafted by Plaintiff titled "Accommodation Requests/Working Ideas." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 20.] According to Plaintiff, the document restated requests from his May 2012 letter. [*Id*.] The document also included new requests, such as the flexibility to fix team resources and to modify lessons to match students' needs like his colleagues were permitted without fear of reprisal for "so-called 'non-collaboration.'" [*Id*.] In the document, Plaintiff complained that principal Stephanie Palmer criticized him in evaluations for actions that she pre-approved. [*Id*.] Plaintiff further complained that supervisors held him to stricter standards than his colleagues. [*Id*.]

On January 5, 2015, Plaintiff told union representative Kathy Saylor that he tends to "push through" sickness more than he should and that he was experiencing chronic stress and depression. [*Id*. at ¶ 24.] Plaintiff also indicated that he was vomiting, dry-heaving a dozen times a day, felt he was in a "hostile environment," and was "not sure how much more * * * of a beating" he could take health-wise. [*Id*.] Plaintiff stated, "I have to balance stress, health and workplace functionality with the problem that if I can't be at 100% there is the risk of them using that against

me," and said he may have to go on medical leave after all or just hang it up and walk away, "because no job is worth this." [*Id.*]

E.    **2014-15 School Year Review**

Ms. Palmer became principal of Hinsdale South at the beginning of the 2014-15 school year. [21 (Def.'s Stmt. of Facts), at ¶ 39.] Ms. Palmer had been a supervisor over teachers for 14 years. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 106.] Plaintiff is the only tenured teacher she has rated "unsatisfactory" since the Performance Evaluation Reform Act ("PERA") went into effect in 2012 and only one of two teachers overall. [*Id.*] Human Resources made Ms. Palmer Plaintiff's evaluator for the 2014-15 school year.[13] [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 40.] Ms. Palmer has taken courses in conducting evaluations, received training on State of Illinois evaluation models, and is certified by the State of Illinois as a "Qualified Evaluator" to evaluate teachers. [21 (Def.'s Stmt. of Facts), at ¶ 41.]

On August 29, 2014, Ms. Palmer had a beginning of the year conference with Plaintiff. [31-3 (Palmer Dep. Tr.), at 68.] The purpose of the meeting was "to decide his Professional Growth Plan as part of the option that he chose, to have an observation and Professional Growth Plan for his observation year as a tenured teacher." [*Id.*] Defendant asserts that Ms. Palmer testified that she did not review prior evaluations prior to her evaluation of Plaintiff. [21 (Def.'s Stmt. of Facts), at ¶ 42.] However, the cited evidence does not support that assertion and the

---

[13] Although Defendant's citation does not establish that this related change occurred in the 2014-15 school year, Plaintiff admits that fact. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 40.] Plaintiff challenges the reason Defendant identifies for the change. The Court agrees that the cited deposition testimony of Ms. Palmer does not establish the reason for the change in evaluators. Although Ms. Palmer mentions possible reasons for the change, she also testified that she was not at the meeting where the decision was made. [21-3 (Palmer Dep. Tr.), at 67.] Ms. Palmer therefore does not have first-hand knowledge of the reason for the change. Rather, her testimony on that issue is based on hearsay and therefore is inadmissible.

Court therefore does not credit the statement for the purposes of this motion for summary judgment. The distinction is not dispositive in any event.

On November 6, 2014, Plaintiff was observed by Ms. Palmer. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 54.] Ms. Palmer took notes on her laptop during the observation. [*Id.*] Defendant contends that Ms. Palmer shared her notes with Plaintiff via email and arranged for a post-conference. [21 (Def.'s Stmt. of Facts), at ¶ 50.] Plaintiff contends that he did not receive the notes until the end of the post-conference. [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 56.] For the purposes of this motion, the Court credits Plaintiff's position, which is supported by evidence. Again, the distinction is not dispositive.

Ms. Palmer testified that she was concerned with sarcastic comments Plaintiff made at the beginning of the class period, that his lesson was off task, that a student interacted with Plaintiff in a way that demonstrated a lack of respect between teacher and student, that his questioning did not encourage higher-level thinking, and that there was a lack of seriousness about the subject matter. [21 (Def.'s Stmt. of Facts), at ¶ 57.] Ms. Palmer also testified that she believed that the lesson did not require students to analyze, synthesize, evaluate any of the higher-level thinking skills that students should be required to do and that Plaintiff was not following the team curriculum and objectives. [*Id.* at ¶ 58.] Plaintiff asserts in his Local Rule 56.1 statement that he told superintendent Bruce Law and the assistant superintendent Tammy Prentiss that "every sentence in [Ms. Palmer's] evaluations contained misrepresentations to outright lies." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 31.] The Court addresses certain of those purported inconsistencies below. Plaintiff and Ms. Palmer met on November 10, 2014 to discuss Ms. Palmer's observation, but the discussion was not completed in the time allotted for the meeting. [21 (Def.'s Stmt. of

Facts), at ¶ 59.]   On November 11, 2014, Plaintiff requested that a new evaluator replace Ms. Palmer.   [60-1 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 60.]

On November 14, 2014, before the second post-observation conference, Ms. Palmer informed Plaintiff that Hinsdale Central High School Principal Dr. Mark Kolkman would perform a second observation of Plaintiff's teaching.   [21 (Def.'s Stmt. of Facts), at ¶ 61.]   Ms. Palmer and Plaintiff (and possibly others) met on November 17, 2014 in order to complete the post-observation meeting that had begun on November 10, 2014.[14]   [*Id.* at ¶ 62.]

Over the 2014 Thanksgiving break, Mr. Maniscalco rejected the union's and Plaintiff's choice for a new evaluator because Mr. Maniscalco wanted Plaintiff "to feel that the evaluation process is fair and NOT filled with any biases."   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 19.] Plaintiff made numerous complaints about proper procedures not being followed, bias, and Ms. Palmer's purportedly dishonest evaluation.   [*Id.*]   Although Plaintiff protested about Ms. Palmer remaining as his supervising evaluator, Plaintiff learned that Ms. Palmer would remain as his supervising evaluator and would determine his final rating.   [*Id.*]   Plaintiff then rescinded his second observation request until they could "properly deal with the" first review, stating "Mrs. Palmer and I did not jointly fill out the Post-Observation form.   She did it entirely herself. If you truly want to help put my mind at ease regarding the fairness of this year's evaluation process, then I ask that you please work with me on this."   [*Id.*]   Mr. Maniscalco denied his request and required a second observation immediately after the break.   [*Id.*]

Ms. Palmer requested to meet Plaintiff for a summative evaluation conference on Tuesday January 6, 2015 between 1:15-2:05 p.m., earlier than originally scheduled.   [70 (Def.'s Resp. to

---

[14] Plaintiff denies this fact, relying in large part on his contention that proper procedures were not followed and that the meeting therefore was not a proper post-observation meeting.   Even assuming that Defendant did not follow the proper procedures, that does not change the fact that the meeting occurred.   The Court therefore credits the fact.

Pl.'s Stmt. of Add'l Facts), at ¶ 21.]  The union intervened, stating that based on the established protocol outlined in the "D86 Observation and Evaluation Procedures," Ms. Palmer could not do this.  [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 21.]  According to the union, Ms. Palmer had to give Plaintiff time to reflect and improve (if needed) based on Dr. Kolkman's post-observation feedback, which he had yet to receive.  [*Id*.]  The union went on to say that Ms. Palmer then had to conduct Plaintiff's mid-year conference with reflections, make possible mid-year adjustments to Plaintiff's PGP, and jointly complete a mid-year conference form.  [*Id*.]  Plaintiff complained to the superintendent Law and the assistant superintendent Prentiss that Ms. Palmer had predetermined Plaintiff's rating and was not giving him a fair evaluation.  [*Id*.]

Plaintiff also complained numerous times to and about superiors regarding (1) the adverse health effects caused by their ongoing retaliatory actions over three months; (2) a hostile work environment; (3) job interference and disruption; (4) intentionally building a false case to terminate/dismiss Plaintiff; (5) extra meetings causing adverse health effects; (6) omissions and misrepresentations in Ms. Palmer's observation notes; and other actions Plaintiff believed were unfair.  [*Id*. at ¶ 22.]  From January to February 2015, Plaintiff sent numerous emails asking to postpone the "evaluation process" to address the many complaints he had regarding unanswered requests for accommodations and performance deficiencies in specific job areas associated with his requested accommodations.  [*Id*. at ¶ 23.]  Specifically, Plaintiff discussed the following requested accommodations: (1) continuing the prior year district-required "weekly meetings" to give Plaintiff the type of feedback he requested in 2012, and (2) more time to complete extra requirements imposed by Ms. Palmer.  [*Id*.]

On January 19, 2015, Plaintiff asked for more time to prepare for his mid-year conference. [57 (Pl.'s Ex. K.2), at 84.]  Ms. Palmer and Mr. Maniscalco confirmed that the meeting would

proceed on January 21, 2015. [*Id*. at 85.] Plaintiff was out sick on January 21, 2015. [*Id*. at 87.] The mid-year conference was rescheduled for January 29, 2015. [*Id*. at 110.] Mr. Maniscalco told Plaintiff the mid-year conference would not be postponed again without a doctor's certification. [70 (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts), at ¶ 25.] On January 28, 2015, Plaintiff said he was working on getting a doctor's note and that the meetings relating to the mid-year conference would need to be put on hold until further notice. [*Id*.] Plaintiff provided a doctor's note from Dr. Ndrio, which stated:

> [Plaintiff] is treated in my clinic for severe Attention Deficit and Hyperactivity Disorder, inattentive type, with underlying depression, anxiety and tic disorder, for which he is being treated with several psychotropic medications. He was seen today in my clinic presenting with significant anxiety and depression worsening his underlying ADHD symptoms due to increased stressors at work. While treatment continues to be optimized, it will be helpful that Mr. Malas has more time to prepare for his performance review until next reassessment in 2 weeks.

[57 (Pl.'s Ex. K.2), at 113.] Still, the mid-year conference was held on January 29, 2015. [*Id*. at 119.] Mr. Maniscalco and Ms. Palmer did an unannounced, unscheduled mid-year meeting in his classroom, where Plaintiff (a) felt "ambushed," (b) was unprepared as a result, (c) did not get to share his "student survey" results Ms. Palmer had wanted, (d) was questioned about low scores on a quiz that Dr. Gaubatz and his bio team colleagues had prepared his students for the prior week when he was out sick, and (e) was asked to provide evidence of email collaboration. [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 25.]

Plaintiff filed two grievances with Mr. Law and Ms. Prentiss under Board Policy 2:260, which entitled Plaintiff to a "prompt" investigation. [*Id*. at ¶ 26.] The first grievance was a seventeen-page harassment complaint dated "January 18, 2015" and filed on January 26, 2015 against Mr. Maniscalco, Ms. Palmer, and Dr. Gaubatz. [*Id*.] The grievance requested immediate intervention to stop three months of ongoing harassment that had—according to Plaintiff—

interfered with Plaintiff's job duties and adversely affected his health. [*Id*.] Plaintiff indicated that the harassment included a "retaliatory agenda" to "terminate/RIF"[15] him at the "expense and violation" of his "Federally mandated rights" as a qualified individual under ADA. [*Id*.]

The second grievance was dated February 4, 2015 and again requested immediate intervention and an independent, third-party investigator. [*Id*.] This grievance included a complaint against Ms. Prentiss because she allegedly had delayed investigation of Plaintiff's grievance by making it contingent upon him first completing his annual performance evaluation. [*Id*.] Ms. Prentiss said that Policy 2:260 did not require her to use the District's investigatory process and that Plaintiff could seek remedies elsewhere if unhappy. [*Id*.]

Ms. Palmer testified on the first day of her deposition that she attended one investigative meeting conducted by Ms. Prentiss and Mr. Maniscalco (who were there District's two designated complaint managers). [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 27.] Ms. Palmer further testified that she did not know if Dr. Gaubatz was listed on the complaint and did "not remember the specific nature of the complaint other than that [Ms. Palmer] was too harsh in [her] evaluation of [Plaintiff's] teaching." [*Id*.] On the second day of her deposition, approximately three months later, Ms. Palmer testified that the she was aware that Plaintiff had filed a grievance against her, Dr. Gaubatz, and Mr. Maniscalco about their not accommodating his disability and that the three of them "were all kind of lumped together on the complaint." [*Id*.] She further testified that she did not recall the specifics but it included "that [she] was somehow going after [Plaintiff] for something." [*Id*.] Plaintiff also complained to Mr. Law and Ms. Prentiss in emails about unfair actions by Plaintiff's supervisors, including failure to follow district evaluation procedure, scheduling two-hour summative meetings after his part-time work day was over, actions causing

---

[15] RIF refers to Reductions in Force.

adverse effects to his health, violating his PERA and ADA rights (including their purported failure to engage in the ADA interactive process), and more.   [*Id*. at ¶ 29.]

Plaintiff received an "unsatisfactory" summative rating in the 2014-15 school year.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 10.]   Ms. Palmer started a 90-day remediation plan that Plaintiff would have to complete with a rating of proficient or better to stay employed.   [70 (Def.'s Resp. to Pl.'s Stmt. Add'l Facts), at ¶ 36.]   However, successful completion of a remediation plan does not remove the original "unsatisfactory" rating or protect a teacher from dismissal in the event of a RIF.   [*Id*. at ¶ 37.]   The collective bargaining agreement between Defendant and teachers' union in effect that year placed employees on salary "steps" according to experience.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 16.]   Starting with the 2014-15 school year, this calculation did not include "any school year(s) in which the Employee" was not "rated 'Proficient' or 'Excellent.'"   [*Id*.]

Student course enrollment determines staffing needs and the number of full-time positions or "FTEs" ("Full Time Equivalents") including any RIF.   [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 104.]   On February 6, 2015, preliminary enrollment tallies for 2015-16 became available.   [*Id*.] "[P]rincipals, assistant principals and department chairs determined FTE based on * * * student course selections."   [*Id*.]   Student course selections were divided into sections and the number of class sections per course that needed to be taught determined the number of FTEs needed for each department.   [*Id*.]

On February 11, 2015, Dr. Gaubatz announced that there would be a RIF resulting in a loss of between 0.8 to 1.8 FTEs in the science department and that "someone [would] have to go."   [*Id*. at ¶ 37.]   Pursuant to Section 24-12 of the Illinois School Code, Plaintiff's "unsatisfactory" put him in "Group 2" of the sequence of honorable dismissal, by statute, the first group to be discharged in a RIF without recall rights (after recently hired teachers with no evaluation of which

there were none in the department at the time). [*Id.*] Plaintiff was the only teacher rated unsatisfactory that year. [*Id.*] Of the 43 other science teachers in the District, five were Group 3 ("proficient") and thirty-eight were Group 4 ("excellent"). [*Id.*] On March 23, 2015, the Board of Education approved a RIF. [55-3 (Pl.'s Ex. L), at 95.] As discussed in more detail below, Plaintiff had resigned by this date. No teachers from the science department were honorably discharged. [*Id.*] The teachers named in the resolution were to be honorably dismissed at the end of the 2014-15 school year. [*Id.*]

Ms. Palmer and Plaintiff did not meet for a summative conference during the 2014-15 school year. [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 40.] Ms. Palmer sent Plaintiff an email cancelling the summative conference on February 6, 2015. [*Id.*] Ms. Palmer testified at her deposition that she did conduct a summative conference with Plaintiff and that in Plaintiff's summative conference he demonstrated "his lack of ability to reflect on his teaching practice" and he believed that he should have received an excellent rating. [*Id.*] According to Ms. Palmer, Plaintiff "did not give me any indication that he was, you know, willing to accept my criticism." [*Id.*] Defendant notes that Ms. Palmer and the Plaintiff met for a mid-year conference during the 2014-15 school year on January 29, 2015 and that Plaintiff's summative conference was cancelled at his request. [70 (Def.'s Resp. to Pl.'s Stmt. Add'l Facts, at ¶ 40.]

### F.   Plaintiff's Condition During 2014-15 School Year

On January 5, 2015, Plaintiff told the union he was experiencing "never ending" stress and depression. [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 24.] Plaintiff further informed the union that he was vomiting and dry-heaving up to a dozen times a day. [*Id.*] Plaintiff felt he was in a "hostile environment" and was "not sure how much more * * * of a beating" he could take health-wise. [*Id.*] Plaintiff stated, "I have to balance stress, health and workplace functionality with the

problem that if I can't be at 100% there is the risk of them using that against me." [*Id.*] Plaintiff

further stated that he may have to go on medical leave or just hang it up and walk away "because

no job is worth this." [*Id.*] On January 21, 2015, while Plaintiff was out on leave because he

"could barely function" and was "severely impaired," Plaintiff told Mr. Maniscalco that he was

sick, was throwing up, had high blood pressure with tachycardia while on two blood pressure

medications, and was concerned about his students. [*Id.*] Subsequently, Mr. Maniscalco sent

Plaintiff an email at home threatening him with "insubordination" and "appropriate discipline."

[*Id.*]

> On February 19, 2015, Dr. Jaweed Sayeed wrote a letter stating:
>
> [Plaintiff] has been under my care for severe hypertension. He has been placed on
> multiple medications for control and in spite of that his blood pressure is not under
> ideal control. I have advised him to be compliant with medications and if possible
> avoid stressful situations. I have also advised him to follow up with his Primary
> Care Physician regularly.

[56-2 (Pl.'s Ex. M.2), at 71.] On February 20, 2015, Plaintiff's family physician Dr. Milani wrote

that Plaintiff's conditions were severe and stated "I will complete his disability paperwork as well

as it obvious that he is not able to return to work." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 39.]

Psychiatrist Dr. Ndrio said [Plaintiff] was not medically capable of teaching on February 19, 2015

and that he didn't know when it was since Plaintiff's last appointment that he became incapable

of teaching. [*Id.*] Dr. Ndrio doubled the dosage on one of Plaintiff's medications due to "major

depressive disorder, recurrent worsening ADHD worsening, [and] general anxiety worsening."

[*Id.*] Dr. Ndrio further advised Plaintiff to re-enter an outpatient day program. [*Id.*]

### G. Plaintiff's Leave and Resignation

On February 16, 2015, a student who Plaintiff contends was upset over a seating change

made a complaint against Plaintiff. [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 38.] Although there

were no allegations of any physical conduct, an attorney for Defendant told Mr. Maniscalco to file a report against Plaintiff with the Illinois Department of Children and Family Services ("DCFS"). However, no record of such a report was identified through a Freedom of Information Act request. [*Id*.] Ms. Palmer testified that the director of deans conducted an "investigation" into the allegations of "inappropriate conversations." [*Id*.]

In the substance of the complaint, a female student complained that when she asked to go to the guidance counselor, Plaintiff pretended he did not hear and responded by asking whether she had requested to go to the gynecologist.[16] [21 (Def.'s Stmt. of Facts), at ¶ 75.] The student further complained that Plaintiff was speaking about "blow jobs" in the hallway and that he also was talking about vaginas. [*Id*.] On February 18, 2015, Plaintiff and union representatives attended a meeting with Mr. Maniscalco and attorney Mr. Gleason regarding the allegations. [*Id*.] Following the February 18, 2015 meeting, Defendant put Plaintiff on paid administrative leave so that the investigation could continue. [*Id*. at ¶ 78.] On March 1, 2015, Plaintiff resigned from his employment while he still was on paid administrative leave. [*Id*. at ¶ 79.] Plaintiff resigned before Ms. Palmer had the opportunity to implement Plaintiff's remediation plan, which she had been working on at the time of his resignation.[17] [*Id*. at ¶ 80.]

Plaintiff filed suit against Defendant on November 20, 2015, purporting to bring claims under Title I of the Americans with Disabilities Act (ADA), Title I of the Civil Rights Act of 1990,

---

[16] Although Plaintiff denies the truth of these allegations, Plaintiff does not argue that Defendant mischaracterizes the allegations as made by the student.

[17] Plaintiff disputes this fact, arguing that he would not have been able to return to work had he not resigned and that he would have been honorably dismissed in any event. However, neither point changes the fact that Plaintiff resigned before the plan was implemented. Furthermore, neither point changes the fact that Ms. Palmer was working on the plan at the time of Plaintiff's resignation.

and the Illinois Human Rights Act.  [See 1.]  Before the Court is Defendant's motion for summary judgment.  [See 73.]

## II.  Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by * * * citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. Each party opposing a motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec*, 191 F.R.D. at 584. Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. See *Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## III.     Analysis

### A.     Failure to Accommodate Claim

"In order to establish a prima facie case of failure to accommodate in accordance with the ADA, 'a plaintiff must show that: (1) [he] is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).   "To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements of [his] claim." *Id*. at 748 (citing *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009).   An employer only must provide accommodations that are medically necessary. *Atkinson v. SG Americas Securities, LLC*, 693 Fed. App'x 436, 440 (7th Cir. 2017); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009). Furthermore, an employer is not required to provide the exact accommodation requested. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013).   Defendant argues that Plaintiff has not identified sufficient evidence for a reasonable to jury to find that Defendant failed to reasonably accommodate Plaintiff's disability.[18]   Defendant also argues that—to the extent that Plaintiff's failure to accommodate claim relates to his May 1, 2012 letter—Plaintiff's failure to accommodate claim is time barred.   The Court begins with the latter argument.

### i.     Statute of Limitations

In his May 1, 2012 letter, Plaintiff made numerous requests that he characterized as "accommodations."   Specifically, Plaintiff requested (1) continued understanding and patience, (2) the opportunity to take ownership and fix problems, along with the necessary feedback to do

---

[18] Defendant does not challenge whether Plaintiff can establish the first two elements of his failure to accommodate claim, at least for the purposes of its summary judgment motion.

so, (3) collaboration on strategies for improved communications, (4) the opportunity to maximize job performance by putting disability-related strengths to greater use for the benefit of students, colleagues, the department, the school, and the community, (5) due consideration of his disabilities when scheduling teacher assignments. [21-7, at 14-15.] Defendant argues that—to the extent Plaintiff's failure to accommodate claim is based on this May 1, 2012 letter—Plaintiff's failure to accommodate claim is time barred. "A plaintiff in Illinois * * * must file a charge of discrimination [under the ADA] with the EEOC within 300 days of some offending conduct." *Teague v. Nw. Mem'l Hosp.*, 492 Fed. App'x. 680, 684 (7th Cir. 2012) (citing 42 U.S.C. §§ 12117(a), 2000e-5(e)(1)). A failure to accommodate claim accrues when the accommodation is denied. *Paul v. Chicago Transit Auth.*, 2018 WL 1378183, at *4 (N.D. Ill. Mar. 19, 2018). "[A] refusal to accommodate is a discrete act—not an ongoing omission—and therefore the continuing violation doctrine does not apply" to failure to accommodate cases. *Teague v. Nw. Mem'l Hosp.*, 492 F. App'x 680, 684 (7th Cir. 2012) (citations omitted). The first time Plaintiff filed a charge of discrimination against Defendant was on February 27, 2014. [21 (Def.'s Stmt. of Facts), at ¶ 31.]

In its opening brief, Defendant contends that it should have become apparent that Plaintiff's requested accommodations were denied by the first day of the 2012-13 school year. Before getting into the substance of this argument, the Court begins by noting that it only is addressing the requests that Plaintiff specifically discusses in the portion of his response brief addressing his failure to accommodate claim. To the extent that Plaintiff included legal argument and analysis of other requested accommodations in his Local Rule 56.1 statement and his response to Defendant's Local Rule 56.1 statement, they are disregarded. *Trumbull*, 575 F. App'x at 685. That being said, Plaintiff's response brief focuses on Plaintiff's request that due consideration of

his disabilities be considered when scheduling his teaching assignments. As part of this request, Plaintiff asked that due consideration be given to "[c]onsolidating [his] 2012-13 teaching schedule from two preps in three rooms to two rooms." [21-7, at 14.] Plaintiff lists other considerations that Plaintiff wanted Defendant to consider when scheduling Plaintiff's teaching assignments. To the extent that Plaintiff contends that Defendant failed sufficiently to take into account these considerations in scheduling Plaintiff's teaching assignments for the following year, Plaintiff presumably would know about that when he received his schedule for that year. The Court therefore agrees that Plaintiff may not proceed with his failure to accommodate claim to the extent that it depends on the requests made in the May 1, 2012 letter. In any event, Plaintiff's response brief addresses later requests for accommodations that Plaintiff argues actually were denied.[19] The Court will now turn to a review of those requested accommodations.

### ii.     Medically Necessary Accommodations

Defendant also argues that Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Plaintiff's requested accommodations were medically necessary. "[E]mployers are only required to provide reasonable accommodations that are medically necessary." *Blickle v. Illinois Dep't of Children & Family Servs.*, 2015 WL 5693081, at *4 (N.D.

---

[19] The Court notes that there are some internal inconsistencies in Plaintiff's arguments that make them difficult to address. For example, at some points, Plaintiff indicates that he made the same request—(*i.e.*, his request for a consistent schedule)—starting in the 2011-12 school year through the 2014-15 school year. However, Plaintiff indicates that the requests made in the 2011-12 school year (*i.e.*, the requests formalized in the May 2012 letter) were never denied. But Plaintiff indicates that his requests relating to the 2014-15 school year were denied. The Court therefore does not understand the requests made in the 2011-12 school year to be the same as the requests made by Plaintiff relating the 2014-15 school year. Although both requests related to Plaintiff's desire for a more consistent schedule, an examination of the details of those requests further supports the conclusion that the requests are not the same. In his May 1, 2012 letter, Plaintiff asked that due consideration be given to "[c]onsolidating [his] 2012-2013 teaching schedule from two preps in three rooms to two rooms." [21-7, at 14.] With respect to his 2014-15 schedule, however, Plaintiff asked that he keep his schedule from the prior school year or, in the alternative, that he teach all biology classes in one classroom.

Ill. Sept. 28, 2015) (citing *Esktrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009)).[20]

Thus, to the extent that Plaintiff has not identified evidence that his requested accommodations were medically necessary, the Court agrees that Plaintiff's failure to accommodate claim fails. Plaintiff identifies the following categories of requests:

1. Plaintiff's requests for a consistent schedule, including Plaintiff's requests relating to the 2014-15 school year either to keep the same schedule as the prior year or teach biology only in one classroom.

2. Relating to the 2014-15 school year, Plaintiff's alternative requests to teach his assigned geophysics class in the same classroom as his he taught his biology class.

3. Plaintiff's requests to be limited to one curriculum team.

4. Plaintiff's requests to continue his weekly meetings in the 2014-15 school year.

5. Plaintiff's requests relating to department and team meetings.

6. Plaintiff's request for more time to prepare for a performance evaluation.

With respect to the first and second categories of requests, Plaintiff has identified the unrebutted testimony and letters provided by Dr. Ndrio. Defendant argues that Plaintiff has not established medical necessity because Plaintiff's doctor merely stated that it would be beneficial for Plaintiff to have predictable and consistent classroom teaching assignments and merely recommended that Plaintiff be assigned to a teaching schedule that would allow him to teach one course in one classroom in his areas of expertise. However, Defendant has not cited any authority for the proposition that medical recommendations are insufficient to establish medical necessity, as the term is applied under the ADA. In fact, the Seventh Circuit has allowed accommodation claims to proceed past summary judgment based on medical recommendations. See *E.E.O.C. v.*

---

[20] Plaintiff argues that *Esktrand* does not stand for the proposition that employer's only are required to provide accommodations that are medically necessary. Rather, according to Plaintiff, *Esktrand* stands for the proposition that "employers must be made aware of any specific, nonobvious accommodation requests that are medically required." [60, at 18.] The Court does not find Plaintiff's analysis persuasive and agrees with Defendant's interpretation, which is supported by *Blickle*.

*Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005) (concluding that a reasonable jury could conclude that defendant was sufficiently aware of plaintiff's disability to trigger the interactive process where "[plaintiff] gave to [defendant] notes from two doctors indicating that she suffered from neuropathy and *recommending* that she be permitted to avoid walking long distances" (emphasis added)).

Similarly, Defendant also argues that Plaintiff's failure to accommodate claim misses the mark because Plaintiff's doctor would not testify that Plaintiff was incapable of teaching more than one subject. According to Defendant, this demonstrates that Plaintiff's requested accommodations were not medically necessary. However, Defendant does not cite to any authority for the kind of evidence necessary to establish that an accommodation is medically necessary under the ADA. "In the general sense, 'an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.'" *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (quoting 29 C.F.R. pt. 1630 app. § 1630.2(o)). Thus, "reasonable accommodation" is defined to include "modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii). It therefore appears that "medically necessary" accommodations are those that enable an individual with a disability to enjoy equal employment opportunities. "If the disability affects the employee's work ability, the employer must then consider if a 'reasonable accommodation' can be made." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) (citing *Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538 (7th Cir. 1995)).

Although Defendant argues that Plaintiff was capable of teaching his scheduled classes, the undisputed evidence shows that Defendant gave Plaintiff a negative evaluation because of performance issues that Plaintiff contends are related to his disabilities. This contention is supported by admissible evidence. Dr. Ndrio testified that Plaintiff teaching more than one subject would "would have caused more anxiety, would have caused more stress and would have destabilized him." [21-2 (Ndrio Dep. Tr.), at 61-62.] Furthermore, as discussed above, Plaintiff had to go on leave multiple times because of the stress associated with Plaintiff's disabilities.[21] Without further argument from Defendant as to why this evidence is insufficient to establish the requisite level of medical necessity, the Court denies Defendant's motion for summary judgment on the basis that Plaintiff's requests relating to his schedule were not medically necessary, as the term is used in the ADA. Plaintiff's third category of requests—his requests to be limited to one curriculum team—also is supported by Dr. Ndrio's recommendation that Plaintiff be limited teaching one subject.

With respect to Plaintiff's request that Defendant continue his weekly meetings for the 2014-15 school year, however, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Plaintiff's requests were medically necessary. The Court recognizes that, as part of his fitness evaluation of Plaintiff, Dr. Fink recommended: "[i]nitially, weekly meetings would provide both [Defendant] and [Plaintiff] practical information about job performance. Thereafter, the level of supervision could be empirically determined." [21-1, at (Pl.'s Dep. Ex.3).]

---

[21] The Court recognizes that Defendant may dispute whether Plaintiff's disabilities caused Plaintiff to go on leave, as there is evidence that other stressors (*e.g.*, Plaintiff's daughter threatening to hurt herself) may have at least contributed to Plaintiff's health problems. However, the Court must draw all reasonable inferences in favor of Plaintiff on Defendant's motion for summary judgment, and Plaintiff has presented sufficient evidence for a reasonable jury to find that Plaintiff's disabilities necessitated his leave.

However, Plaintiff does not identify any evidence from which a reasonable jury could conclude that such meetings were medically necessary in the 2014-15 school year.

Similarly, with respect to Plaintiff's requests relating to department and team meetings that Plaintiff believed would "help improve his concentration, focus, productivity, engagement/participation and collaboration during team meetings," Plaintiff does not identify any evidence from which a reasonable jury could conclude that his requests were required by his disabilities. In fact, although Plaintiff contends that he gave suggestions of active tasks that he could handle and that would help him stay more attentive and actively engaged during meetings (addressing a problem that Dr. Gaubatz had brought to his attention), Plaintiff does not even take the time to elaborate on the specifics of these requests in his response brief. Plaintiff therefore has waived any failure to accommodate claim based on those requests. *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.")

Finally, that leaves Plaintiff's request for more time to prepare for his performance evaluation. In January of 2015, Plaintiff requested additional time to prepare for his mid-year conference. Although Plaintiff provided a doctor's note indicating that Plaintiff's symptoms were worsening due to stressors at work and indicating that it would be helpful to give Plaintiff more time to prepare for his performance evaluation, Defendant went ahead with the performance evaluation. Because Defendant does not address this requested accommodation, to the extent that Plaintiff's failure to accommodate claim is based on this requested accommodation, Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim based on this request is denied.

In sum, the Court grants Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim to the extent that the claim is based on the fourth and fifth categories of requested accommodations. However, the Court denies Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim to the extent that the claim is based on the first, second, third, and sixth categories of requests.

### iii.    Corroborating Evidence

Defendant also argues that Plaintiff's failure to accommodate claim fails because Defendant was not obligated to provide an accommodation until Plaintiff provided a doctor's note or other corroborating evidence establishing the medical necessity of the requested accommodations. In support of that argument, Plaintiff cites cases in which the Seventh Circuit held that "disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor" before an employer is required to provide an accommodation. See, *e.g., Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) (collecting cases).

Still, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803-04 (7th Cir. 2005); *id*. at 804 ("Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification."); *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786-87 (7th Cir. 2016) ("The school district simply sat on its hands instead of following-up with [plaintiff] or asking for more information." (citation omitted)). "[P]roperly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must

specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness. The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285-86 (7th Cir. 1996).

Defendant could have requested a doctor's note as part of the interactive process. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (noting that the defendant "would have been entitled to request a doctor's note verifying [plaintiff's] condition as part of the interactive process"). However, Defendant could not simply ignore Plaintiff's request for an accommodation until Plaintiff figured out that Defendant required medical documentation.

The Court is especially concerned with Defendant's failure to request documentation earlier in this case, as Plaintiff has identified evidence indicating that Defendant intentionally decided not to ask for documentation. In a July 19, 2012 memorandum from John Fester to Mr. Courtney, in discussing how to identify possible accommodations, Mr. Fester stated, "we could include his doctor at this step to see what is recommended. However, we may be stuck with the answers."[22]  [55-1, at 22.]  In contrast, Plaintiff cites his continuous efforts to address his requested accommodations. Under the ADA, "both the employer and employee are responsible for engaging in an 'interactive process' to find a reasonable accommodation for the employee's disability." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (citations omitted). Both parties are required to make a 'good faith effort' to determine what accommodations are necessary, but if a breakdown of the process occurs, 'courts should attempt

---

[22] In his statement of additional facts, Plaintiff includes additional details regarding this memorandum. [See 60-2 (Pl.'s Stmt. of Add'l Facts), at ¶¶ 55-59.]  Although the Court has reviewed these details, the Court does not restate them here.

to isolate the cause * * * and then assign responsibility.'" *Id*. (citing *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Thus, to the extent that Defendant seeks summary judgment based on Plaintiff's failure to provide corroborating evidence that Defendant never requested, Defendant's motion for summary judgment is denied.[23]

### iv. Accommodations Provided

Finally, Defendant argues that it actually did provide the accommodations requested by Plaintiff. Specifically, Defendant contends that it accommodated Plaintiff by allowing Plaintiff to have four biology sections in one classroom and one geophysics section in another classroom in response to Plaintiff's request to teach biology only in one classroom.[24] [69, at 15.] Defendant recognizes this was not Plaintiff's requested accommodation, but argues that Plaintiff's "apparent

---

[23] Plaintiff references Defendant's representations to the EEOC regarding earlier requests for corroborating evidence. Specifically, Defendant represented to the EEOC that it "requested current medical information from Complainant regarding his disabilities and needs" and that "Complainant underwent evaluations by medical professionals in order to clarify what specific medical conditions Complainant suffered from that may need accommodations." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 111.] Plaintiff argues that this representation is misleading because the referenced requests and evaluations were in relation to Plaintiff's fitness-for-duty inquiry, not Plaintiff's requested accommodations. Because Defendant does not rely on these earlier requests—which may have related solely to Plaintiff's fitness-for-duty inquiry—the Court does not find Defendant's representation to the EEOC relevant.

[24] At one point in his brief, Plaintiff asserts that it was not his ideal preference that he teach all-biology classes. However, he later makes clear that it was not his preference to teach all biology classes at the expense of a reduced schedule and corresponding pay decrease. As noted by Plaintiff, Defendant denied Plaintiff's request to teach all biology classes in the same classroom in June 2014. Although Defendant later allowed Plaintiff to reduce his schedule to teach four biology classes, this resulted in a pay decrease. [57 (Pl.'s Ex. K), at 2.] If Defendant could not reasonably accommodate Plaintiff without a pay decrease, the reduction would not amount to a failure to accommodate. *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998) ("The employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion.").

displeasure with the way in which [Defendant] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, is irrelevant." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014).

However, that does not accurately reflect Plaintiff's requested accommodations. Plaintiff requested to teach one class in one classroom or, in the alternative, to teach two classes in one classroom (preferably the same two classes Plaintiff taught the prior year). Although Defendant argues that these requested accommodations were unreasonable, Defendant has not established that these requested accommodations were unreasonable as a matter of law. "[A]n accommodation is unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters the nature of the program or service." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018). "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). Although Dr. Gaubatz identified reasons why Plaintiff's use of the same classroom to teach his biology and geophysics classes was not optimal, Defendant does not explain how these reasons establish that Plaintiff's requested accommodation to teach in one classroom was unreasonable as a matter of law. While some of the purported justifications for denying Plaintiff's request may have some merit (*i.e.*, the lack of computers in the biology classroom), other justifications seem tenuous at best (*i.e.*, the substance of the posters on the wall). Furthermore, Defendant does not identify evidence explaining why Plaintiff could not keep the same schedule he had during the prior year. Because Plaintiff has not established that Plaintiff's requested accommodations were unreasonable as a matter of law, the Court denies Defendants motion for summary judgment on Plaintiff's failure to accommodate claim on that basis.

## B.    Retaliation Claim

"To prove a retaliation claim, a plaintiff must prove '(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two.'" *Koty v. DuPage Cty., Illinois*, 900 F.3d 515, 519 (7th Cir. 2018) (quoting *Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011)).    "If this initial burden is satisfied, 'the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action.'"    *Id.* (quoting *Dickerson*, 657 F.3d at 602).    Plaintiff argues that he was subject to at least[25] two adverse employment actions—the decision to rate him "unsatisfactory" on his final performance evaluation and his constructive discharge[26]—that are causally connected to statutorily protected activities.    Defendant argues that neither of these actions qualify as an adverse action under the ADA.    Defendant further argues that Plaintiff cannot establish a causal connection between his unsatisfactory rating and any statutorily protected activities.

### i.    "Unsatisfactory Rating"

Plaintiff brings a retaliation claim based on his "unsatisfactory" performance evaluation. Generally, a negative performance evaluation alone does not constitute an adverse action for the purposes of a retaliation claim.    *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir. 1996) ("There is little support for the argument that negative performance evaluations alone can

---

[25] The Court only will consider these two purported adverse employment actions, as Plaintiff only offered argument with respect to these actions.    *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." (internal quotation marks and citations omitted)).

[26] Defendant argues that Plaintiff's retaliation claim is time barred to the extent that it relies on Dr. Gaubatz purportedly giving him a logistically worse schedule for the 2012-13 school year.    Plaintiff does not identify the schedule change as an adverse action in support of his retaliation claim.    Because Plaintiff has implicitly conceded the argument, the Court does not address it.    *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir.2013) ("Because [plaintiffs] did not provide the district court with any basis to decide their claims, and did not respond to the [defendant's] arguments, these claims are waived").

constitute an adverse employment action."); *Chaib v. Indiana*, 744 F.3d 974, 987 (7th Cir. 2014), overruled on other grounds, *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).[27]

Plaintiff does not argue that the negative performance evaluation alone is the adverse employment action. Rather, Plaintiff argues that the resulting denial of an annual salary increase was the adverse employment action. As noted by Plaintiff, the Seventh Circuit has held that "the denial of a raise qualifies as an adverse employment action." *Farrell v. Butler University*, 421 F.3d 609, 614 (7th Cir. 2005) (citing *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000)). Thus, to the extent that a negative performance evaluation results in a salary decrease, the negative performance evaluation constitutes an adverse employment action for the purposes of a retaliation claim. See *Smart*, 89 F.3d at 442 (recognizing that a negative performance evaluation may constitute an adverse employment action if it led to other negative consequences, such as probation).[28]

---

[27] Plaintiff argues that Defendant incorrectly interprets *Smart* to be limited to future consequences. [60, at 26 n.11 ("Although with *Smart* it must be pointed out that while it's true the Seventh Circuit found little support for the argument that negative performance evaluations alone can constitute an adverse employment action, there is *nothing to support* the interpretation D86 imposes on *Smart* that limits this to future consequences." (internal quotation marks and citations omitted)).] The Court does not understand Defendant to be arguing that a negative performance evaluation must result in some future harm to constitute an adverse employment action. In any event, the Court recognizes that *Smart* stands for the proposition that an adverse employment action must result in some additional harm (contemporaneous or future) to constitute an adverse employment action.

[28] Plaintiff also argues that Defendant mischaracterizes the proper standard for finding an adverse action sufficient to establish a retaliation claim, citing the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). The Court recognizes that, "[f]or Title VII retaliation purposes, a materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (citations and internal quotation marks omitted). Still, "Title VII's anti-retaliation provision does not protect an employee against 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Id.* at 867-68 (citing *Burlington*, 548 U.S. at 68). Thus, in the retaliation context, the Seventh Circuit has continued to hold that a negative performance evaluation alone is insufficient to establish an adverse action. See, *e.g., Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016).

Defendant does not dispute that Plaintiff's negative performance evaluation meant that Plaintiff automatically would have been deprived of a raise in the future based upon the terms of the applicable collective bargaining agreement. However, Defendant argues that Plaintiff's negative performance evaluation nonetheless does not constitute an adverse employment action because Plaintiff resigned before his salary for the following year even was considered. [69, at 11.] Although Plaintiff resigned before his salary for the following year was determined, Plaintiff has identified evidence showing that his negative performance evaluation contractually was tied to his ability to qualify for a salary increase in the future. Defendant does not explain why this would not be enough to dissuade an employee from engaging in protected activity. In fact, Plaintiff has identified the kind of evidence the Seventh Circuit found lacking in the cases in which it has concluded that a negative performance evaluation alone was insufficient to establish an adverse action. *Cf. Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016) ("Nor does [plaintiff] adduce admissible evidence that his evaluation [was] tied to his bonus or any other tangible job consequence."). The Court therefore rejects Defendant's argument that Plaintiff's negative performance evaluation does not constitute an adverse employment action.

Defendant also argues that Plaintiff has not identified sufficient evidence for a reasonable jury to find a causal connection between his protected activity and his negative performance evaluation for the 2014-15 school year. The Court begins by noting that the parties dispute whether Plaintiff must identify sufficient evidence to establish "but-for" causation. The Seventh Circuit has held that "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). However, the Seventh Circuit since has noted that it is an "open question"

whether this holding remains viable in light of statutory revisions in the ADA Amendments Act ("ADAAA"). *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). The Court need not resolve that issue, however, as Plaintiff has not identified sufficient evidence to establish any causal connection between any protected activity and his negative performance evaluation.

Defendant focuses on the fact that Plaintiff does not identify sufficient evidence for a reasonable jury to find a causal connection between Plaintiff's unsatisfactory rating for the 2014-15 school year and Palmer's knowledge of the EEOC charge of discrimination. However, Plaintiff's EEOC charge of discrimination is not the only statutorily protected activity in which Plaintiff contends to have engaged. Plaintiff also claims to have made numerous requests for accommodations, which also are statutorily protected. *Arce v. Chicago Transit Auth.*, 738 F. App'x 355, 359 (7th Cir. 2018) (holding that a request for an accommodation "does constitute protected activity under the ADA" (citing *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015)), reh'g denied (July 19, 2018).

That being said, Plaintiff has not identified sufficient evidence for a reasonable jury to find a causal connection between his unsatisfactory rating for the 2014-15 school year and any requested accommodation. In arguing that there is a causal connection between his unsatisfactory rating for the 2014-15 school year and any requested accommodation, Plaintiff argues that he "can go line-by-line though his evaluation and bring testimony and evidence to bear on the dishonesty therein, and he would relish the opportunity to do so." [60, at 36.] However, summary judgment is "the 'put up or shut up' moment in a lawsuit." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks and citation omitted)). Because Plaintiff had the opportunity to present his best arguments to the Court (and made efforts to do so in a

substantially oversized brief), the Court only will consider arguments actually raised and properly presented to the Court (while still taking into account Plaintiff's status as a *pro se* litigant).

Plaintiff identifies a few examples of what he claims are misrepresentations establishing a causal connection. First, Plaintiff asserts that "personal information he shared with superiors about his disabilities * * * suddenly appeared in his final evaluation as 'evidence' of alleged deficiencies in support of an 'unsatisfactory' rating[.]" [67-2, at 36.] In support of that assertion, Plaintiff cites to his assertion in his Rule 56.1 statement that "[Ms.] Palmer quoted a portion of her formal observation notes in her post-observation form. [Ms.] Palmer altered this quoted portion by adding, deleting and resequencing material to make [Plaintiff's] teaching appear 'disconnected,' to falsely support her evaluative conclusions about him, and to counter statements in a corrected-for omissions version of her notes that he gave her."[29] [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 32.][30] However, as discussed above, this statement of fact was not properly presented to the Court. Furthermore, the statement does not even identify facts showing how the statements were altered in a misleading manner and instead cites to the underlying source documents for the Court to determine how the materials were misleading. In any event, upon review of the underlying documents, there are no objectively apparent misrepresentations.

Second, Plaintiff challenges Ms. Palmer's evaluation because it purportedly criticized Plaintiff for leaving early from a meeting while omitting the fact that he was granted permission to do so because of his part-time schedule, which was an accommodation. [67-2, at 37.]

---

[29] Plaintiff actually only cites to the fourth sentence in Statement of Fact No. 32, which is the second sentence quoted by the Court here. However, the Court also includes the third sentence for additional context.

[30] Plaintiff also cites his Statement of Fact No. 75. As discussed above, the Court does not find that statement—which merely asserts what Plaintiff wrote in a communication—to be relevant to the Court's analysis.

Specifically, in the portion of her final summative evaluation of Plaintiff's job performance discussing Plaintiff's knowledge of school, community, and self, Ms. Palmer stated: "This should be a supportive environment where [Plaintiff] should feel confidant contributing his expertise and past experiences. Instead he is mostly silent and left the pullout day of team planning early, instead of choosing to stay to complete the planning with others." [58-1, at 148.] Plaintiff argues that this is evidence of retaliation because Plaintiff was given permission by Dr. Gaubatz to leave early. Although Ms. Palmer was not copied on the email in which Dr. Gaubatz stated that Plaintiff could leave early, Ms. Palmer was at a meeting in which it was discussed that Dr. Gaubatz gave Plaintiff permission to leave early. [49-3, at 110.]

According to Plaintiff, because his leaving early was an accommodation, the fact that the negative performance evaluation specifically references this accommodation is evidence of a causal connection. The Court recognizes that Defendant placed Plaintiff on a part-time schedule in lieu of giving Plaintiff his requested classes and requested classrooms. The Court also recognizes that Dr. Gaubatz told Plaintiff that part-time employees did not have to attend the entire pullout day. However, there is no evidence that Plaintiff was placed on a part-time schedule because he was unable to attend the pullout day (or other similar department meetings). The Court acknowledges that it may have been unfair to criticize Plaintiff for leaving the pullout day early when he had been given permission to do so by Dr. Gaubatz. However, "the question is not whether the employer's performance ratings were right but whether the employer's description of its reasons is honest." *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997) (internal quotations and punctuation omitted)); see also *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("It is not the court's concern that an employer may be wrong about its employees performance, or may be too hard on its employee."). The fact that Ms. Palmer criticized Plaintiff

for leaving the pullout day early when Dr. Gaubatz had given him permission to do so is not sufficient to establish that Plaintiff's requested accommodations were causally connected to Ms. Palmer's negative evaluation of Plaintiff, especially in light of the many other criticisms of Plaintiff in the evaluation. Thus, to the extent that Plaintiff seeks to bring a retaliation claim based on his negative evaluation, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

### ii. *Constructive Discharge*

Defendant also argues that Plaintiff has not presented sufficient evidence for a reasonable jury to conclude that Plaintiff was constructively discharged. "A constructive discharge constitutes an adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) (citing *Chapin*, 621 F.3d at 679). "The Seventh Circuit sets a high bar to establish a constructive discharge claim, because 'employees are generally expected to remain employed while seeking redress.'" *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 2015 WL 9200560, at *10 (N.D. Ill. Dec. 15, 2015) (citing *Chopin*, 621 F.3d at 679).

The Seventh Circuit "has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). "In the first form, an employee resigns due to alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby

allowing an employer to address a situation before it causes the employee to quit." *Id.* (citations omitted). In the second form, an employee resigns "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002); see also *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable."). In such a "situation, if the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Chapin*, 621 F.3d at 679 (citation omitted). "This form of constructive discharge, however, does not eliminate the need for the plaintiff to show that his working conditions had become intolerable." *Id.* (citation omitted). "[A] working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin*, 621 F.3d at 679 (citing *Cigan*, 388 F.3d at 333).

Plaintiff argues that he can establish that he was constructively discharged under both theories. To the extent that Plaintiff contends that he was constructively discharged because Defendant acted in a manner that a reasonable employee would understand to have communicated that he was about to be terminated, the Court disagrees. Plaintiff argues that it was communicated that he was about to be terminated because on February 11, 2015, Dr. Gaubatz notified the science department that there would be a RIF that would result in a loss of 0.8 to 1.8 teaching positions in the department and that "someone [would] have to go." [60-2 (Pl.'s Stmt. of Add'l Facts), at ¶ 37.] Plaintiff claims that—had he not resigned—he would have been honorably discharged in the RIF based on his unsatisfactory rating.

However, it is not the Court's "position to speculate on 'what ifs.'" *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 530 (7th Cir. 2015). "The only way to know how matters will turn out is to let the process run its course." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004). Here, given that the RIF would go into effect the following school year, Plaintiff could have remained in his position to determine whether he actually would have been honorably dismissed. Plaintiff has not cited any case in which a court found that a party was constructively discharged based on the threat of a termination in the distant future. In fact, constructive discharge cases require conduct demonstrating that the employee "immediately and unavoidably will be terminated." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 529 (7th Cir. 2015). "Requiring that an employee demonstrate that [he] immediately will be discharged comports with the rationale underlying the constructive-discharge doctrine. We require that an employee's working conditions become intolerable before finding a constructive discharge 'because employees are generally expected to remain employed while seeking redress.'"[31] *Id.* (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)). Accordingly, Plaintiff may not proceed on the theory that the speculative possibility of an honorable dismissal for the following school year amounted to a constructive discharge.

To the extent that Plaintiff argues that he constructively was discharged because he was placed on paid administrative leave, that argument also fails. As noted by Defendant, the Seventh Circuit has held that "a person who is on leave with pay, with a temporary (though unsatisfying) reassignment pending an investigation of serious job misconduct, who resigns rather than waits for the conclusion of reasonable prescribed due process procedures of the institution, has not from

---

[31] In the constructive discharge context, "the burden remains on the employee to show why he would have had to quit immediately, before he found the other job; why, in other words, his duty to mitigate damages did not require him to remain." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 528 (7th Cir. 2015) (citation and internal quotation marks omitted).

an objective standpoint been constructively discharged." *Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005). Plaintiff resigned less than two weeks after being placed on paid leave. Plaintiff therefore may not proceed on the theory that his being placed on paid administrative leave amounted to a constructive discharge.

That leaves Plaintiff's argument that he was subject to an intolerable work environment. "In order to show that a hostile work environment resulted in [his] constructive discharge, [Plaintiff] must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that [his] resignation was an appropriate response." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004)). "Constructive discharge refers to a situation 'in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable.'" *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). "The 'working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because * * * an employee is expected to remain employed while seeking redress.'" *Id.* (quoting *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003). There is no subjective component to this inquiry. *Suders*, 542 U.S. at 147. Rather, the standard is whether "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign." *Id.*

Plaintiff argues that he can satisfy this standard because he has identified evidence that he "was subjected to ongoing harassment over a period of at least 4-5 months where he was subjected to different terms and conditions of employment (e.g. different supervisor, violations of District established evaluation procedure; violations of PERA state rights associated with teacher evaluations; subjected to different standards for triggering 'disciplinary' meetings; a project that

mocked his disability, by stating that ADHD is caused by mother's who smoked while pregnant; unreasonable interference with [Plaintiff's] work duties such as six routine meetings being turned into twenty; targeted 'walkthroughs,' added evaluation requirements in violation of District procedure; [Plaintiff being] put in no-win situations; and more."   [60, at 42.]   However, this alone does not come close to establishing the kind of objectively intolerable environment the Seventh Circuit has held is necessary to establish a constructive discharge.   *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (concluding that "the presence of multiple nooses and the veiled threats by [plaintiff's] coworkers, which caused [plaintiff] to fear for his own safety and that of his family, rose to the level of a hostile work environment); *cf. Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 605 (7th Cir. 2014) (affirming summary judgment on constructive discharge claim where defendant gave plaintiff negative performance reviews, constantly criticized her, made offensive comments about her age because such conduct, "though unpleasant, [did] not meet the extremely high standard for a constructive discharge").

Finally, to the extent that Plaintiff argues that Defendant's denial of his requested accommodations forced him to resign, such a claim would be an improper and duplicative repackaging of his failure to accommodate claim.   *Koty v. Zaruba*, 2017 WL 4150684, at *7 (N.D. Ill. Sept. 19, 2017) ("Courts * * * do not recognize ADA retaliation claims that are simply repackaged failure to accommodate claims.").   Thus, to the extent that Plaintiff seeks to bring a retaliation claim based on his claim that he constructively was discharged, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

### C.    Constructive Discharge Claim

"To prevail on [his] claim for constructive discharge, [Plaintiff] must show that a hostile work environment existed and that the abusive working environment became so intolerable that

her resignation qualified as a fitting response." *Ekstrand*, 583 F.3d at 977-78 (internal quotation marks and citations omitted). Because Plaintiff has not identified sufficient evidence for a reasonable jury to find that Plaintiff was subjected to the kind objectively intolerable environment necessary to establish a constructive discharge, as discussed above, the Court grants Defendant's motion for summary judgment on Plaintiff's constructive discharge claim.

### D. Hostile Work Environment and Discrimination Claims

Plaintiff's response brief mentions hostile work environment and discrimination claims. However, Defendant does not address these claims. Because these claims are referenced in the complaint, the Court would assume that these claims remain viable. However, as noted by Defendant, the Seventh Circuit has not yet decided whether a hostile work environment claim can be brought under the ADA. *Holyfield-Cooper v. Bd. of Educ. of the City of Chicago*, 604 F. App'x 504, 508 (7th Cir. 2015) (noting that the Seventh Circuit has not addressed whether a hostile work environment claim exists under the ADA). Plaintiff already has addressed whether such a claim exists in his response brief. The Court therefore gives Defendant until July 22, 2019 to file a brief no longer than five pages addressing whether a hostile work environment claim can be brought under the ADA.

### IV. Conclusion

For these reasons, Defendant's motion for summary judgment [73] is granted in part and denied in part. The Court gives Defendant until July 22, 2019 to file a brief no longer than five pages addressing whether a hostile work environment claim can be brought under the ADA. Further status hearing set for July 25, 2019 at 9:00 a.m.

Dated: July 1, 2019

Robert M. Dow, Jr.
United States District Judge