IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRETT M. MALAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-10490 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| HINSDALE TOWNSHIP DISTRICT NO. 86, | ) ) | |
| | ) | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff in this action asserts claims under Title I of the Americans with Disabilities Act (ADA), Title I of the Civil Rights Act of 1990, and the Illinois Human Rights Act [1]. The Court previously issued a lengthy opinion granting in part and denying in part Defendant's first motion for summary judgment [75]. At this stage in the litigation, two of Plaintiff's original claims remain active: (1) failure to accommodate; and (2) hostile work environment. Before the Court are Defendant's motion for summary judgment on Plaintiff's hostile work environment claim [128] and Plaintiff's cross-motion for summary judgment on his failure to accommodate claim [132]. For the reasons stated below, the Court grants Defendant's motion for summary judgment on the hostile work environment claim [128] and denies Plaintiff's motion for summary judgment on the failure to accommodate claim [132]. This case is set for a telephonic status hearing on May 18, 2022, at 9:30 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

I.  **Background**[1]

A.  **Relevant Factual Background**

Plaintiff Brett Malas resides in Montgomery, Illinois. [139 at ¶ 1.] Defendant Hinsdale Township School District No. 86 ("Defendant" or "the District") is a school district in Hinsdale, Illinois. [*Id.* at ¶ 2.] There are two high schools in the District, Hinsdale Central High School ("Hinsdale Central") and Hinsdale South High School ("Hinsdale South"). [*Id.*] The District employed Plaintiff as a science teacher at Hinsdale South from 2006 until March 1, 2015. [139 at ¶ 3.] Plaintiff has several diagnosed medical conditions, including depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), and hypertension. [See 139 at ¶ 4; see also 21-2 at 51.]

Plaintiff worked under the immediate supervision of Dr. Julie Gaubatz, chairperson of the science department at Hinsdale South. [139 at ¶ 3.] Dr. Gaubatz has been responsible for creating course schedules for all teachers in her department every year since 2004. [143 at ¶ 2.] The science department at Hinsdale South offers various levels of biology, physics, chemistry, and geophysics, as well as AP Environmental Science, AP Chemistry, AP Biology, AP Physics, Earth Science, Astronomy, and Anatomy and Physiology. [143 at ¶ 3.] In any given year, Dr. Gaubatz is responsible for assigning between 15 and 20 full- and part-time teachers to between 60 and 70 sections of science classes. [143 at ¶ 4.]

Dr. Gaubatz considers many factors when assigning teachers to courses and curriculum teams. [143 at ¶ 5.] Specifically, she takes into consideration (i) teacher qualification to teach the course, (ii) teacher experience with the curriculum, (iii) teacher requests, and (iv) the total number of different courses assigned per teacher. [*Id.*] With respect to course loads, full-time teachers are to have no more than two different courses assigned when possible, and part-time teachers are to

---

[1] Because this is the parties' second round of summary judgment briefing, the Court assumes familiarity with the case and reiterates only those facts which are relevant to the instant motions.

have no more than one course assigned when possible. [*Id.*] Other factors include interpersonal working relationships, workload, specialized assignments, and professional strengths/areas of growth. [*Id.*] Dr. Gaubatz also collects information from teachers about their preferences and subject matters for which they are licensed and collects student enrollment and interest data to determine the number of sections to create for each subject. [143 at ¶ 6.] She then makes preliminary teaching assignments and notifies the teachers of their tentative placements. [*Id.*]

It is not uncommon at Hinsdale South for a teacher's schedule to change year to year, especially for teachers who are qualified to teach multiple courses. [143 at ¶ 8.] And there are many reasons why a teacher's schedule may change from year to year. [143 at ¶ 7; see also *id.* at ¶¶ 11–15 (outlining changes in faculty personnel, course offerings, and student enrollment between the 2013–2014 and 2014–2015 school years).]

Plaintiff was a National Board-Certified teacher qualified to teach multiple science courses. [143 at ¶ 23.] Over the course of his time at Hinsdale South, Plaintiff taught several subjects, including Earth Science, Chemistry, Geophysics, Biology, and AP Biology. [143 at ¶ 24.] Plaintiff admits that he taught a variety of subjects over time and was qualified and able to do so, but asserts that his past classes do not reflect on his teaching abilities during the 2014–2015 school year "given the escalating symptoms of his disabilities." [*Id.*]

In February 2013, Plaintiff went on medical leave. [139 at ¶ 12.] He testified that he took leave at that time because his daughter was threatening to hurt herself, though he also testified that his concern for his daughter was the "final straw" that necessitated the leave after ongoing teaching and administrative frustrations he had been experiencing. [91-1 at 78.] On March 12, 2013, at the request of Troy Courtney, the District's Director of Human Resources, Plaintiff underwent a fitness-for-duty examination. [139 at ¶ 13-14; 91-1 at 215.] In a report dated April 1, 2013, Dr.

Peter Fink described Plaintiff's mental difficulties, "mental overload," possible sleep apnea, hypertension, and Plaintiff's "self-described stress related depression and anxiety." [*Id.* at ¶ 15.] Dr. Fink reserved his opinion as to Plaintiff's fitness to return to work until Plaintiff underwent a psychological/neuropsychological evaluation. [*Id.*]

On August 11, 2013, Dr. Fink submitted an updated report to the District after Plaintiff's neuropsychological evaluation, which had been performed by Kathleen Nugent, a licensed clinical psychologist. [139 at ¶ 16.] The report noted that "under stressful circumstances, [Plaintiff] is prone to a worsening of his symptoms," and explained that "[b]ecause [Plaintiff's] treating psychiatrist diagnosed [Plaintiff] with depression, anxiety, and attention deficit hyperactivity disorder it is important that he continue to comply with his treating psychiatrist's recommendations." [139 at ¶ 18.]

Malas returned to work at the start of the 2013–2014 school year. He was assigned to teach two courses, biology and academic reading biology, and would work with a co-teacher, Randy Brogan. [139 at ¶ 25.] Plaintiff and his supervisor, Dr. Gaubatz, met weekly throughout the school year. [139 at ¶ 26.]

### B. Plaintiff's Accommodation Requests for the 2014–2015 School Year

On February 18, 2014, Plaintiff met with Domenico Maniscalco, the District's Chief Human Resources Officer, and Naomi Shepherd, Regional Union Representative UniServ Director, to request accommodations for the upcoming 2014–2015 school year. [139 at ¶ 28.] Plaintiff filed an EEOC charge of discrimination on February 27, 2014 asserting: "[Defendant] has been aware of my disabilities since around January 2012. During my employment, I requested reasonable accommodations, which were not provided. On or about May 6, 2013, I received a negative performance evaluation." [139 at ¶ 32.]

4

Plaintiff requested four accommodations that remain relevant at this stage in litigation: (1) for a consistent schedule, including Plaintiff's requests relating to the 2014–2015 school year either to keep the same schedule as the prior year or teach biology only in one classroom; (2) alternatively, to teach his assigned geophysics class in the same classroom as his biology class; (3) to be limited to one curriculum team; and (4) for more time to prepare for a performance evaluation.

          1.      **Consistent Schedule**

Plaintiff's first request was to teach only biology and in one classroom, [139 at ¶ 29], or, alternatively, if he "could just keep the same schedule" he had during the 2013-2014 year "with the same co-teacher." [139 at ¶¶ 29–30; 91-1 at 87, 243–44.] According to Plaintiff, Maniscalco told him "I promise I will see to it personally that your schedule will be the same or better as this year," which Plaintiff took to mean that he would be "teaching the same classes as this year [i.e. biology and co-taught academic reading biology] in one room or teaching all biology classes." [91-8 at 65, 89, 92.]

Later that week, Dr. Gaubatz informed Plaintiff that he had been assigned to teach four sections of biology and one section of geophysics for the 2014–2015 school year. [See 139 at ¶ 31.] Defendant intended this schedule to meet "most of the schedule considerations" Plaintiff requested because (i) he was qualified to teach both by state and national certification, (ii) he had multiple years of experience teaching both courses and contributed to writing the curricula for both, (iii) the majority of this assignment matched his request, and (iv) as a full-time teacher, he was assigned only two courses. [143 at ¶ 22.] According to Dr. Gaubatz, Plaintiff's scheduling requests required that she use "complex, multi-step pathways" to facilitate him. [143 at ¶ 27.] The first step was to identify a teacher who was qualified to teach Geophysics who could take Plaintiff's

Geophysics class, and the second step required finding a Biology class on another teacher's schedule that Dr. Gaubatz could give to Plaintiff. [*Id.*] Despite using these "complex, multi-step" methodologies, Dr. Gaubatz was not able to accomplish Plaintiff's goals while adhering to the primary scheduling factors: teacher qualifications, teacher experience, course and schedule requests, and workload. [143 at ¶ 28–29.[2]]

### 2. Classroom assignments

Plaintiff also requested that he be allowed to teach all of his classes in one classroom. When the 2014–2015 school year began, however, he was assigned to teach his Biology courses in Room 107, and his Geophysics course in Room 112, "a designated GeoPhysics room." [143 at ¶ 36.] Without permission from Dr. Gaubatz or anyone else, Plaintiff began the school year teaching Geophysics in Room 107, rather than the assigned classroom. [133 at ¶ 37.] Room 107 connected to the Geophysics "Pre/Stockroom," and had in the past been designated as a Geophysics room. [139 at ¶ 38.] On September 29, 2014, Maniscalco wrote an email to Plaintiff about his room assignments, which stated in relevant part:

> We cannot move the entire Geophysics classroom 15 feed to the other side of the hall without disrupting the operation and the educational environment of our students. Room 107 is a Biology classroom, not Geophysics. The classroom *cannot* be changed. Your request is *not* a reasonable accommodation and *cannot* be granted as this is a disruption to our students and does not meet the educational requirements for the classes.

[139 at ¶ 39; 91-8 (Pl's Ex. K1) at 115.] A few days later, Gaubatz sent an email to Maniscalco providing more detail about the classroom assignments. She wrote:

---

[2] Plaintiff disputes this fact in its response to Defendant's statement of additional facts, but his citation to the record does not support his statement. Plaintiff asserts that with respect to his scheduling requests, "there were available options that were not considered," [143 at ¶ 28], but he cites to a July 19, 2012 memorandum explaining the interactive process for Plaintiff's requests. [See 91-8 (Pl.'s Ex. K1) at 22.]

6

> GeoPhysics (and science in general) can be taught in any room, inside or outside, or really anywhere you have a skilled teacher; however, an optimal room for GeoPhysics, for both student learning and teacher collaboration opportunities, would be a room that is equipped for that content and used by teachers who teach that content. Room 112 has these characteristics more so than [Room 107].

[139 at ¶ 40; 91-8 at 124.] She then outlined several differences between the two rooms. First, Room 112 had 6 computer stations for geophysics team-designed lab investigations, while Room 107 did not have any computers. [*Id*.] Second, Room 112 had geophysics-centered posters, while Room 107 had biology-centered posters. [*Id*.] Third, Room 112 had geophysics lab equipment, while Room 107 had biology lab equipment. [*Id*.] Fourth, Room 112 had moveable tables for large motion labs, while Room 107 did not. [*Id*.] Finally, because there would be no other geophysics teachers in Room 107, there would be no geophysics papers on the side tables, writing on the whiteboard, etc. [*Id*.] In an email to Maniscalco from attorney William Gleason with the subject line "Room 112 VS 107," Gleason states: "I did review the email that you referenced. The first part where it says you can teach this class in any science class is what really concerns me from an ADA perspective. If he can adequately deliver the necessary curriculum from the class we really should be giving it to him." [139 at ¶31; 55-3 at 51.]

### 3. One curriculum team

Because Plaintiff was assigned to teach two different subjects (Biology and Geophysics) for the 2014–2015 school year, he was also expected to participate on both curriculum teams to work on course development and share course responsibilities with other teachers in the department. [143 at ¶ 32.] As an accommodation, Plaintiff requested that he be required to participate on only one curriculum team. [143 at ¶ 33; 139 at ¶ 47.] Defendant allowed Plaintiff to participate on the Biology curriculum team only. [143 at ¶ 34.]

7

### 4. Additional preparation time for mid-year conference

Plaintiff's mid-year performance conference was scheduled for January 15, 2015. [91-9 at 78.] Stephanie Palmer became principal of Hinsdale South at the beginning of the 2014–2015 school year [114 at ¶ 5] and was coordinating Plaintiff's conference. Approximately two hours before the conference was scheduled to begin, Plaintiff emailed Palmer stating that he would need more time to prepare for his conference. [91-9 at 78.] Palmer responded to Plaintiff's email by stating, in relevant part: "We need to keep this appointment today. You are not required to prepare anything for this meeting." [91-9 at 79.] Palmer agreed to postpone Plaintiff's official mid-year conference until January 21, 2015. [See 91-9 at 79, 84.] Plaintiff was ill on January 21, 2015, however, and the meeting was rescheduled a third time. [139 at 64–65.] Maniscalco told Plaintiff the mid-year conference would not be postponed again without a doctor's note. [91-9 at 110.] On January 28, 2015 Plaintiff produced a doctor's note from Dr. Ndrio, which stated:

> [Plaintiff] is treated in my clinic for severe Attention Deficit and Hyperactivity Disorder, inattentive type, with underlying depression, anxiety and tic disorder, for which he is being treated with several psychotropic medications. He was seen today in my clinic presenting with significant anxiety and depression worsening his underlying ADHD symptoms due to increased stressors at work. While treatment continues to be optimized, it will be helpful that Mr. Malas has more time to prepare for his performance review until next reassessment in 2 weeks.

[139 at ¶ 69; 91-8 at 113.] The meeting nonetheless took place the following day, on January 29, 2015. [139 at ¶ 70.] Palmer's conference summary notes that Plaintiff "was okay with meeting but that he was not prepared with all of his materials." [91-9 at 119.]

### C. Performance Evaluations

Plaintiff's hostile work environment claim centers around teaching performance observations conducted during the 2014–2015 school year. On August 26, 2014, Plaintiff learned that he would be evaluated by Palmer (Principal of Hinsdale South) during the upcoming school

8

year. [91 at ¶ 6.] Maniscalco (Defendant's Chief Human Resources Officer) informed Palmer that she would evaluate Plaintiff for the 2014–2015 school year because she was new to the school at that time and thus did not already know the Plaintiff. [91 at ¶ 8.]

Palmer first observed Plaintiff on November 6, 2014. [91 at ¶ 9.] She took notes while observing the lesson. [*Id.*] Plaintiff met with Palmer on November 10, 2014 for a post-observation conference, but did not complete their discussion in the allotted meeting time. [114 at ¶ 10.] On November 11, 2014, Plaintiff asked Maniscalco for a new evaluator. [114 at ¶ 11.] On November 14, 2014, Palmer informed Plaintiff that Hinsdale Central Principal Dr. Mark Kolkman would perform a second observation of Plaintiff's teaching. [91 at ¶ 12.] On November 17, 2014, Plaintiff met with Palmer, Maniscalco, and Union President David Lapetino to complete Palmer's November 10th post-observation meeting. [114 at ¶ 13; 91-9 at 150.]

Two days later, on November 19, 2014, Palmer emailed Plaintiff about a "concern" she wanted to discuss with him. [114 at ¶ 14.] Palmer testified that a student's parent had complained to the school about Plaintiff asking students in one of his classes to express their opinions about abortion, [see 114 at ¶ 14; 91-2 at 70-21], though Plaintiff testified the lesson in question had involved asking the students a variety of bioethics-related questions, and he does not recall whether he asked the students for their views on abortion [91-1 at 345].

In February 2015, Palmer learned of another complaint in which a student claimed that Plaintiff had used sexually inappropriate language in front of his students. [114 at ¶ 16.] In the substance of the complaint, a female student complained that when she asked to go to the guidance counselor, Plaintiff pretended he did not hear and responded by asking whether she had requested to go to the gynecologist. [114 at ¶ 17.] The student further complained that Plaintiff was speaking

9

about "blow jobs" in the hallway and that he also was talking about vaginas.[3] [*Id*.] On February 18, 2015, Plaintiff and union representatives attended a meeting with Mr. Maniscalco and Attorney Gleason regarding the allegations. [114 at ¶ 18.] Following the February 18, 2015 meeting, Plaintiff was placed on administrative leave so that the investigation into the complaint could continue. [114 at ¶ 20.] Plaintiff's Association Representative Naomi Shepherd advised Plaintiff that Defendant was "obligated to investigate the complaint" against him. [114 at ¶ 21.] Plaintiff ultimately resigned from his position on March 1, 2015. [139 at ¶ 80.]

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

---

[3] Plaintiff disputes the truth of these allegations but he does not argue that Defendant mischaracterizes the student's allegations.

### III. Analysis

#### A. Failure to Accommodate

"The ADA requires employers to make reasonable accommodations for a qualified individual with a disability." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 967 (7th Cir. 2020) (citations omitted). To establish a claim of failure to accommodate under the ADA, Plaintiff must demonstrate that "(1) he is a qualified individual with a disability, (2) his employer was aware of the disability, and (3) his employer failed to reasonably accommodate that disability." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014). Because Plaintiff has moved for summary judgment on this claim this time around, the Court construes the facts in the light most favorable to Defendant.

Defendant does not dispute that Plaintiff has a disability as defined by the ADA, see 42 U.S.C. § 12102. Defendant argues, however, that despite having a disability, Plaintiff is not a "qualified" individual with a disability, therefore Defendant was not obligated under the ADA to provide him with reasonable accommodations. See *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) ("[A]n employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job.").

Plaintiff "bears the burden of proving that she is a 'qualified individual with a disability.'" *McAllister*, 983 F.3d at 967 (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)); 42 U.S.C. § 12111(8). To determine whether someone is a "qualified individual," the Court considers "whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015) (quotation omitted). If so,

11

the Court then considers "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. *Id.* (quotation omitted).

It is undisputed here that Plaintiff meets the first element of this test—he was a National Board-Certified teacher and taught at Hinsdale South for nearly 9 years. As Plaintiff states, and Defendant does not contest, he was "well established as a successful science teacher working with his employer well before he began requesting reasonable accommodations for his disabilities," and that "[a]t all times he was able physically, mentally, and professionally to be a high school science teacher." [132 at 7.]

Whether Plaintiff could perform the essential functions with or without reasonable accommodation, however, is a closer call. As Defendant points out, Dr. Ndiro (Plaintiff's physician) testified that Plaintiff "could be capable" of teaching more than one class, [see 138 at 11; 21-2 at 61], but he also noted that "him teaching in different subject areas would have caused more anxiety, would have caused more stress, and would have destabilized him." [21-2 at 61-62.] Furthermore, on October 8, 2014, Dr. Ndiro "strongly recommended that Mr. Malas be assigned to a teaching schedule that will allow him to teach one course in one classroom in his area of expertise, in order to maintain good functionality and maximize job productivity." [91-9 at 1.]

Dr. Ndiro's testimony and written letters do not conclusively reflect an opinion on whether Plaintiff required accommodation. On one hand, Dr. Ndiro noted that Plaintiff "could be capable" of teaching multiple courses, which suggests no need by Defendant to provide accommodations. On the other hand, however, Dr. Ndiro testified that teaching without the accommodations "would have destabilized" Plaintiff, which suggests Plaintiff's inability to teach without his requested accommodations. Dr. Ndiro thus did not clear Plaintiff to work without accommodations, nor did he *require* that Plaintiff be accommodated before returning to teaching. When considered together,

12

Dr. Ndiro's strong recommendation that Plaintiff be allowed certain accommodations and his inability to conclusively determine Plaintiff fit to teach without accommodation demonstrate that genuine issues of material fact prevent summary judgment on this claim. *Cf. Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (although Plaintiff's doctor "did recommend certain accommodations," those recommendations could not "form the basis of a failure to accommodate claim because Dr. Cavanaugh specifically found that Hooper was qualified for his position *without* accommodations").

Furthermore, fact disputes regarding whether Plaintiff's accommodation requests were reasonable preclude summary judgment on Plaintiff's failure to accommodate claim. "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). Plaintiff must first show that his requested accommodation is "reasonable on its face." *Id*. If Plaintiff can do so, then Defendant "has the burden to prove that the accommodation would create an undue hardship on the business." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013).

The Court determined in its last order that "Defendant has not established that these requested accommodations were unreasonable as a matter of law," [75 at 43], and that remains true at this stage in the litigation. Here, Defendant provided additional support for its staffing decisions through an affidavit by Dr. Gaubatz explaining her teacher placement methodologies. This evidence does not prove that Plaintiff's accommodation requests were unreasonable as a matter of law, but in this context—where *Plaintiff* seeks summary judgment on this claim—it sufficiently casts in doubt Plaintiff's showing that his requests were reasonable to confirm the existence of a triable issue of fact.

### B. Hostile Work Environment Claim

In its prior memorandum opinion and order, the Court instructed the parties to submit briefing regarding whether a hostile work environment claim can be brought under the ADA, as the Seventh Circuit had not yet addressed that issue. Since then, the Seventh Circuit has provided clarity, explicitly ruling: "[W]e hold that hostile work environment claims are cognizable under the ADA." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019).

"The same standard governs hostile work environment claims under the ADA as under other employment discrimination laws." *Ford*, 942 F.3d at 856. Thus, to assert a hostile work environment claim, Plaintiff must demonstrate "(1) the environment was both subjectively and objectively offensive; (2) the harassment he suffered was based on his membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016). The Court considers "the totality of circumstances, examining factors such as: 'the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

Defendant seeks summary judgment on Plaintiff's hostile work environment claim on two main grounds. First, Defendant claims that Plaintiff's allegations with respect to this claim are not supported by the facts. Second, even assuming that the allegations are supported by the record, Defendant insists that Plaintiff's contentions and any evidence supporting them fail to establish a severe or pervasive working environment. The Court need not address the first argument because even if the Court accepts all of Plaintiff's fact statements as true (whether or not supported by the

evidence), Plaintiff's hostile work environment claim fails. No jury could reasonably conclude from the evidence that Plaintiff's work environment was objectively offensive, or that the conduct was severe or pervasive.

Assuming that Plaintiff's environment was subjectively offensive, see *Alexander v. Casino Queen*, 739 F.3d 972, 982 (7th Cir. 2014), Plaintiff cannot cite to any facts to demonstrate that his work environment was objectively offensive. Indeed, his only argument is that his "ability to perform his assigned duties was so affected by the Defendant's harassment that there is a litany of tangible physical effects directly resulted from those acts." [113 at 6.] Plaintiff's only support for this purported fact is his own grievance complaint that he filed with the Board of Education on January 18, 2015. [See 133 at 6 (quoting Plaintiff's "Harassment Complaint").] This may help to show that Plaintiff's work environment was subjectively offense, but it does not evince a triable issue of fact on the objectively hostile work environment element. See *Metcalf v. Raimondo*, 2022 WL 657222, at *7 (N.D. Ill. Mar. 4, 2022) (citing *Boss v. Castro*, 816 F.3d 910, 920-21 (7th Cir. 2016)).

Plaintiff would like the Court to infer the presence of a triable issue of fact on the question of an objectively hostile work environment from "the criticisms, monitoring, and disciplinary actions" that he was subjected to, which he claims resulted in the physical manifestations noted above. [113, at 6-7.] But the undisputed evidence shows that the school's actions were not abusive, severe, or pervasive. To begin, the investigations about which Plaintiff complains were initiated in response to student complaints. Whether founded or not, the school was required to investigate these incidents, as Plaintiff's own union representative confirmed. [See 114, at 7-8.] Plaintiff's allegations that he was subjected to excessive evaluation and monitoring also cannot rise to the level of presenting a jury question on an actionable alteration of the conditions of his

employment. Plaintiff received a new evaluator—the principal of a different Hinsdale high school—based on the human resource officer's recollection of Plaintiff's own complaint that he had not been treated fairly compared with other teachers. [*Id*. at 2-3.] Similarly, no reasonable juror could infer hostility from the fact that a post-observation meeting took place over the course of two days because the parties were unable to finish it on the first day. [*Id*. at 4-5.] In short, taking all of these allegations and all others cited throughout the course of Defendant's efforts to work through Plaintiff's teaching schedule during the relevant time period and viewing them in the light most favorable to Plaintiff, no reasonable jury could find an objectively hostile work environment.

At best, Plaintiff points to straightforward remarks in his evaluations that could be viewed as negative commentary on his work habits ("over-preparing") and inability to engage with other members of the team. [*See* 113, at 4-5.] To the extent that these perceived faults reflect manifestations of Plaintiff's disability, they were not communicated in a hostile, disparaging, or disrespectful manner, but rather as part of an ongoing effort to accommodate Plaintiff's requested teaching schedule with the needs of the school as a whole. In contrast to the cases cited by the parties where a hostile environment claim has survived summary judgment, the sum total of Plaintiff's hostile work environment allegations do not even hint at a workplace so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Ford*, 942 F.3d at 851.

**IV. Conclusion**

For these reasons, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim [128] is granted. Plaintiff's motion for summary judgment on his failure to

accommodate claim [132] is denied. This case is set for a telephonic status hearing on May 18, 2022, at 9:30 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

Dated: May 10, 2022

_____
Robert M. Dow, Jr.
United States District Judge